**Calvin SELLARS, Petitioner,**

v.

**W. J. ESTELLE, Jr., Director Texas Department of Corrections, Respondent.**

**Civ. A. No. 77–H–1481.**

United States District Court,
S. D. Texas,
Houston Division.

Dec. 22, 1977.

Calvin Sellars, pro se.

Walter C. Prentice, Asst. Atty. Gen., Austin, Tex., for State of Texas.

FINDINGS OF FACT AND
MEMORANDUM OPINION

COWAN, District Judge.

This habeas corpus petition came on to be heard on December 7, 1977. An evidentiary hearing was conducted. At the hearing Sellars appeared pro se. After the hearing, the Court appointed Mr. Larry Watts, an attorney of this bar, to represent Sellars in connection with further proceedings relating to this application.

The Court announced, at the commencement of the hearing, that the Court would take judicial notice of the record of the case in *Calvin Sellars, Appellant v. State of Texas, Appellee*, Appellate Court No. 3–8–6–2–0 in the Court of Criminal Appeals of the State of Texas at Austin, filed with R. J. Lindley, District Clerk on June 22, 1965 and would further take judicial notice of the record of a factual hearing before the Honorable Ross N. Sterling on the 31st day of March, 1977.

Thereafter, Calvin Sellars presented the oral testimony of Robert B. Schallert, formerly a detective with the City of Houston Police Department and a crucial witness at Sellars' state court trial in February, 1965.

Sellars was tried before the Honorable John F. Onion, Jr., in Harris County, commencing on February 15, 1965, upon a charge of robbery by firearms. On February 23, 1965, the jury returned a verdict of guilty and assessed a punishment of death in the electric chair. Thereafter, the judgment of conviction was commuted to a sentence of 99 years in 1972.

From the date of conviction to date, Sellars' conviction has resulted in a multitude of judicial decisions. They appear in part as follows:

*Sellars v. State*, 400 S.W.2d 559 (Tex.Cr. App.);

*Sellars v. Beto*, 430 F.2d 1150, 1153 (5th Cir. 1970);

*Sellars v. Beto*, 408 U.S. 937, 92 S.Ct. 2865, 33 L.Ed.2d 756 (1972);

*Sellars v. Estelle*, 400 F.Supp. 854 (S.D. Tex.1975);

*Sellars v. Estelle*, 536 F.2d 1104 (5th Cir. 1976).

On March 31 of 1977 in connection with C.A. 76-H-1897 the Honorable Ross N. Sterling conducted a hearing to deal with Sellars' most recent application for writ of habeas corpus. Sellars' basic allegations and Judge Sterling's completely proper rulings on the basis of the petition and the evidence before him are summarized in a copy of Judge Sterling's opinion which is attached hereto as Exhibit A.

In the original trial, Sellars' confession was introduced in evidence after a careful, extensive evidentiary hearing before Judge Onion. At such evidentiary hearing Officers Schallert and his partner, J. E. Hodges, testified (initially out of the presence of the jury) that they had picked up Sellars for questioning as he left work. The essential testimony of Hodges and Schallert before Judge Onion was to the effect that after picking up Sellars for questioning, Sellars was extremely anxious that none of his confederates discern that he was in police custody, and for that reason the next three or four hours were spent at Sellars' request, cruising around in a police vehicle in the northern part of Harris County discussing the possibility of Sellars' giving a statement. Hodges and Schallert testified definitely, without equivocation, that no pressure, physical or psychological, was asserted upon Sellars and that he made the confession which ultimately ensued from these conversations voluntarily and freely of his own will. As will be seen in the testimony set forth below, Schallert and Hodges were questioned not only by counsel, but by Judge Onion himself who was obviously making a determined and conscientious effort to determine whether the Sellars' confession was in fact given voluntarily and not as the result of coercion.

At the original trial, Sellars' account of his interrogation was sharply in conflict with the account of Officers Hodges and Schallert. At his initial trial, initially before Judge Onion and subsequently before the jury, Sellars testified that he was apprehended late in the afternoon as he left work; that after his, Sellars', car was parked, he was forced into the police vehicle and compelled to lie face down on the back floorboard of the police vehicle. He testified that Officer Schallert sat in the back seat with his feet placed upon Sellars' back and legs and told Sellars that if he did not confess, he would never again see the lights of Houston; that he would be killed and left in the ditch outside the limits of the City of Houston. Sellars consistently testified that his initial confession and later oral admission were the result of the fear induced by these threats. Sellars also claimed that he was physically abused and again threatened by an Officer Stephenson, of whom he was particularly afraid because of Stephenson's reputation.

At the hearing on the morning of December 7, 1977, Officer Schallert admitted that Sellars had been apprehended at the time and place he was apprehended because of a desire on the part of the officers to intimidate Sellars. Schallert admitted that from his previous conversations with and contact with Sellars he knew that no information could be obtained from Sellars without intimidation. He further admitted, completely contrary to this testimony before Judge Onion, that Sellars had been placed face down on the rear floorboard of the police vehicle, and that he, Schallert, had placed his feet on Sellars' back or legs. Schallert further admitted that during the period of time while Sellars was being transported face down on the rear floorboard of the police vehicle with Schallert's feet on either his back or legs, Sellars was told that if he did not confess and cooperate, he would never see the lights of the City of Houston again and that Schallert made this threat solely for the purpose of inducing cooperation and obtaining information from Sellars.

Schallert's material testimony at the hearing on December 7, 1977, and his initial testimony at trial are set forth verbatim below in order that the conflict may be apparent.

Officer J. E. Hodges who was driving the police vehicle during the events described

by Schallert, also testified before Judge Onion that no threats had been made against Sellars and that the only reason for keeping Sellars in the vehicle for several hours as the facts were discussed, was Sellars' desire to avoid being seen in the company of the police by others.

This Court finds that Sellars' confession at his initial trial was coerced and that it was admitted into evidence on the basis of perjured testimony by Officers Schallert and Hodges.

While the voluntariness of Sellars' confession has been the subject of previous habeas proceedings, this is the first proceeding in which the current Schallert testimony has been before any Court.

This Court finds that ex-detective Schallert's testimony on December 7, before the Court, with reference to the threats against Sellars and the manner of handling him while within the police car is true, and that the contrary testimony at the original trial was false. Schallert's only explanation on December 7, 1977 was that at the time of the Sellars' trial in 1965, he was "tired." The Court rejects this explanation and finds that portion of Schallert's testimony untrue.

The pertinent testimony of detectives Schallert and Hodges before Judge Onion at Sellars' original trial is set out, in its pertinent parts, below:

(Testimony of Hodges):

Q. And this was about 4:00 p. m. in the afternoon on the 17th of March?

A. When we arrested him?

Q. Yes.

A. Yes, sir.

Q. Where did you take him from there?

A. We first drove over to about, I believe, the 7200 block of Airline where we left his car and we rode around the north side for a while.

Q. Do you know what particular place it was, in front of what business?

A. It was at a beer joint that we left his car.

\* \* \* \* \* \*

Q. From there where did you and your partner and Sellars go? Where did you take Sellars then?

A. We drove around on the north side. *He said he wanted to talk to us and we did.*

\* \* \* \* \* \*

Q. Now where was Sellars sitting in the car? What was his position?

A. He was in the back seat with my partner, Detective Schallert.

\* \* \* \* \* \*

Q. I'll ask you whether or not that you threatened or abused or laid your hands on Calvin Sellars out there?

A. I did not.

Q. You did not?

A. No, sir.

Q. Did you see Lieutenant Leonard threaten him, abuse him, lay his hands on him in any manner?

A. No, sir.

Q. Well, the reason I ask you that is that you don't remember whether he talked to him or not. That's the reason I ask that question. But you are positive he did not touch him?

A. Yes, sir, I am positive he did not touch him.

\* \* \* \* \* \*

Q. Did your partner threaten him, abuse him, coerce him or offer him any immunity or anything or lay his hands on Calvin Sellars?

A. No, sir.

Q. You are positive about that?

A. Yes, sir.

Q. You didn't put your hands on him, or threaten him, or promise anything at any time?

A. I never put my hands on him. I never used any force or threats or anything else.

Q. Did you see anyone else use any coercion or threats or any type of abuse toward Calvin Sellars?

A. No, sir.

\* \* \* \* \* \*

Q. Now, you have been asked, Mr. Hodges, why you drove around—or have been asked about riding around the north side of Houston. Why did you in fact do this?

A. We did this at Calvin Sellars' request.

Q. Did he assign a reason to you for doing that?

A. Yes, sir. He told us he would tell us about it, but he wanted us to arrest one of the other defendants first so they wouldn't know he was the one that copped out to us.

\* \* \* \* \* \*

Q. I believe in your testimony that you never at any time threatened, or abused or laid a hand on this defendant in any manner. Is that correct?

A. That's correct, sir.

Q. Nor did you see your partner, Bob Schallert, do the same?

A. No, sir. No one abused him in any manner while he was in my presence and he did not leave my presence until early in the morning just prior to his being booked in the city jail.

After thorough questioning by both counsel, the Court himself interrogated Officer Hodges to ensure that Sellars had not been intimidated, and Hodges, in response to the Court's question, repeated in essence the testimony he had previously given in response to counsel's questions.

Officer Schallert's testimony to Judge Onion verbatim was as follows:

Q. Back in March of 1974, Mr. J. E. Hodges was your partner, was he not?

A. Yes, sir.

Q. On that date about 4:00 p. m. in the afternoon or thereabouts did you have occasion to arrest the defendant, Calvin Sellars?

A. Yes, sir.

Q. Do you recall where that was, please sir?

A. It was on Highway 59.

\* \* \* \* \* \*

Q. And if you would estimate for me, please sir, roughly about when did you get to the location where the defendant's automobile was left?

A. Probably 4:30 or a quarter of five.

Q. And thereafter you drove around? Is that your testimony?

A. Yes, sir.

Q. At whose request was that done?

A. Calvin Sellars'.

\* \* \* \* \* \*

Q. When you got to the Cedar Lounge was it there that the defendant was asked to get out of the car?

A. Yes, sir.

Q. At that time did you ever handcuff him and push him into the rear of a police vehicle?

A. I don't recall whether he was handcuffed or not. *He was not put in the rear of the police car.*

Q. If you did handcuff him, would he have been handcuffed with his hands behind him?

A. I don't think so. I wouldn't have seen any reason. I don't believe we handcuffed him.

\* \* \* \* \* \*

Q. At any time did you tell him after having left there that we are prepared to stay three or four days, make it easy on yourself, if you can't endure the punishment and sign a confession, you will never see Houston again and you will find your body in a ditch?

A. No, sir.

\* \* \* \* \* \*

Q. At any time did you tell this defendant we picked you up on your job and nobody knows where you are and you are going to tell us what we want you to say, and if you can endure the punishment and won't sign a confession, you will never see Houston again?

A. No, sir.

Q. At any time did you take this defendant with his arms handcuffed behind

his back and place him on the floorboard of the automobile and have your feet and legs on his back with pressure applied to his back?

A. No, sir.

Q. *Did you ever place him on the floorboard?*

A. *No, sir.*

Q. At any time did you go somewhere where Detective Hodges got out of the car and left for a few minutes, and that you told this defendant while he was lying on the floorboard to turn over and look up, we are a little ways from where we are going, we want you to sign a statement and we will help you in the District Attorney's office if you will? Did you ever do that while Detective Hodges had a pistol or a weapon pointed at him?

A. No, sir.

\* \* \* \* \* \*

Q. Did you at any time direct any *threats,* any violence, any *coercion,* any promises toward this defendant in order for him to give you the confession?

A. *No, sir.* The only thing we promised him was we would try to protect him.

\* \* \* \* \* \*

Q. Now, you stated you drove around a while and that was at his request, is that right?

A. Yes, sir.

Q. And I believe in answer to Mr. Zgrouides' question you stated further 'we didn't want to take him in.' You make that statement and that was because you wanted to talk to him and interrogate him about this offense?

A. We wanted to talk to him about it, yes sir.

Q. And you thought you could do that better while you were riding around away from the Police Station?

A. *Sir, we wanted to be fair with Calvin.* We knew these people. We had been dealing with them a long time.

\* \* \* \* \* \*

Q. At your testimony, he was never mistreated at any time?

A. In no way, no sir, at any time.

\* \* \* \* \* \*

Q. He wasn't put down on the floor board where he couldn't see where he was going?

A. No, sir.

Q. You didn't take him out on a lonely country road someplace?

A. No, sir.

\* \* \* \* \* \*

Q. by the Court: It is your testimony you did not at any time after you arrested the defendant and before you brought him back to the main police station or city jail at midnight that you did not make any statement, any threats to him?

A. No, sir, I did not.

Q. by the Court: You did not say you were going to kill him if you didn't get a statement?

A. No, sir.

Q. by the Court: Did you say you didn't hear any other officer make any threats to him in your presence?

A. No, sir. He wasn't mistreated in my presence. .

Q. by the Court: You didn't tell him if he made a statement you would talk to the District Attorney's office to see if you couldn't get him off with five years?

A. No, sir.

It is totally apparent from the trial transcript that Judge Onion diligently tested the voluntariness of Sellars' confession and all of the circumstances related thereto. Judge Onion, understandably and almost inevitably, relied upon the truthfulness of Officers Schallert and Hodges in admitting the confession into evidence. The system mis-fired only because of Schallert's and Hodges' perjury.

After the confession was admitted into evidence, Officer Schallert appeared before

the jury and gave the following testimony material to the present inquiry:

Q. All right, sir, at any time that evening, Mr. Schallert, did you have him (i. e., Sellars) lying on the floorboard and you with your feet on him?

A. No, sir. I did not.

Q. Did you at any time tell the defendant, Calvin Sellars, we are just about close to our destination, you had better make it easy on yourself?

A. No, sir.

Q. Did you at any time tell him that this was—that this serious and we are going to get it one way or another, if he could endure all of the punishment you could dole out and he could hold up to it, it wouldn't do any good, he would come out loser any way? Did you ever make those statements?

A. No, sir. I did not.

Q. Did you at any time ever tell him you were going to kill him?

A. No, sir.

Q. Did you at any time tell the defendant 'you know no one knows where you are, we got you at your job so no one would know where you are—you have got a lot of enemies and a few friends and if you are found in the ditch, no one will worry about you? Did you ever do that?

A. No, sir. I did not.

* * * * * *

Q. Did you at any time, Officer Schallert, use any violence toward this defendant's person?

A. No, sir. I did not.

Q. *Or threaten him?*

A. *No, sir.*

* * * * * *

Q. Would you please tell the jury why you rode around between 4:00 and 6:00 o'clock?

A. We wanted to talk to Calvin and he wanted to talk to us.

Q. And why was the confession taken out behind the North Side Substation?

A. Well, for Calvin's protection.

* * * * * *

Q. One question. Was the defendant, Calvin Sellars, mistreated in any way, Mr. Schallert, by you or any one else in your presence?

A. Not in my presence from the time we arrested him until the time we left him in the jail the next morning.

J. E. Hodges, after the Sellars' confession had been admitted into evidence on the basis of Schallert and Hodges' testimony, testified to the jury as follows:

Q. At any time did you coerce him, *threaten him,* mistreat him in any manner?

A. No, sir.

Q. Did anyone do that in your presence?

A. No, sir.

* * * * * *

A. Did you ever at any time threaten this defendant in any fashion?

A. No, sir.

Q. Was he ever placed on the floorboard with Detective Schallert having his feet on his person?

A. No, sir.

* * * * * *

Q. You have testified that between the hours of 4:00 and 6:00 p. m. roughly that you all rode around a great deal? Is this correct?

A. Yes, sir.

Q. What was the purpose for doing that?

A. It was at his request.

* * * * * *

The material testimony elicited from Officer Schallert on the morning of December 7, 1977, was:

Q. Your name is Robert B. Schallert?

A. Yes.

Q. Sir, were you not served with a subpoena to appear here today, or did you appear voluntarily?

A. Yes, I was.

Q. You were served with a subpoena?

A. I was served with a subpoena.

Q. For the record, you are a former detective of the robbery division of the Houston Police Department, are you not?

A. Yes.

Q. Mr. Schallert, you were recently called to the witness stand by me in March of this year before the Honorable Judge Ross N. Sterling, is that not correct?

A. Yes.

Q. Did you not testify at that time that you were no longer with the Houston Police Department, that you had retired after having served there for some 20 years?

A. Yes, that's true.

Q. I believe that you testified that you are a real estate agent now. Is that correct?

A. I am a real estate broker.

Q. Mr. Schallert, let me ask you one question right off. Do you recall testifying in March before the Honorable Ross N. Sterling that after you put me in the floorboard of the police car on the day of my arrest that Judge Sterling, upon the objection of able counsel for the State, refused to allow me to ask you anymore questions relative to that incident?

THE COURT: Sir, if you want to refer Detective Schallert to some portion of this transcript, give him the page number and the reference.

Q. Well, let me go a little bit farther down before I get to that.

Mr. Schallert, I'm going to ask you five very important questions right off. I would like for you to answer those questions based upon the facts as you know them today, as you know they exist in your own mind today right this moment. After you have answered these questions, then you may elaborate on them if you wish or I will.

My first question is: On the day of my arrest, March 17, 1964, did you not handcuff me behind my back, place me face down in the floorboard of your police car against my will? Will you answer that question yes or no?

THE COURT: Sir, he is not required to answer yes or no. He must give you a direct responsive answer and then he may give any explanation he wishes.

Q. With those instructions from the Court then, will you answer?

A. Well, I am not sure what that means. The answer to the question—your question is—I did put you in the back floorboard of the police car.

Q. The question No. 2, was I not placed face down in the floorboard of the police car, initially held in that position incommunicado and driven around where I did not know where I was being taken to or what was going to happen to me that initial period while in the floorboard?

A. That's true, yes, sir.

Q. Question No. 3, was I thus initially detained incommunicado against my will while placed in the floorboard while I underwent interrogation as to my involvement in the Schepps robbery?

A. Yes, that's right.

Q. Question No. 4. While I was in the floorboard of the police car, was I not sometime or another threatened with my life if I did not fully cooperate with the police? More specifically, did you not tell me that I would never see the lights of Houston again, that my body would be found in a ditch if I didn't get my business straight or confess to my involvement in the Schepps robbery as you so thought I was involved?

A. Yes, you were told that in so many words.

Q. Question No. 5. As a result of this initial incommunicado treatment in the floorboard and these threats made to me, did I not thereafter agree to coop-

Q. erate with you and the result was I gave you a written confession of my involvement in the Schepps robbery?

A. Yours and the others, yes.

Q. Mr. Schallert, let's turn the clock back to March 17, 1964, thirteen and a half years ago.

Sir, back then you being a police officer having served on the force for twenty years, you didn't have *Escobeda, Miranda, Wade,* other hosts of Supreme Court decisions dealing with criminal suspects rights. These decisions weren't hanging over your head at the time that you were performing your duty as a police officer, were they not?

A. Well, I don't know what you mean by "hanging over my head." I was doing my job the way I knew how to do it.

Q. Well, what I mean—

A. I didn't know any of those people. I never heard of them, no.

Q. Those particular decisions which have been referred to as handcuffing the police, you know, in their work dealing with the criminal element suspects.

What I'm talking about, those decisions at that time, of course, they were not in existence. What I meant, they were not hanging over your head. You did not have those to cope with did you?

A. No, I don't believe I did.

Q. What I guess I am getting at, until those Supreme Court decisions came down, as a detective in the Houston Police Department police force for many years fighting crime as a law enforcement officer, you did what you thought was necessary in your job dealing with the criminal element, did you not; criminal suspect defendants arrest?

A. Well, I did what was necessary up to not including any violence.

Q. Well, I guess what I am saying, things were a lot different back in those days?

A. They were a lot different, yes, sir.

Q. As far as dealing with criminal suspects in general were they not?

A. They were a lot different.

Q. In fact, Mr. Schallert, is it not true that back in those days that the Houston robbery division had a reputation all over the country for being pretty rough on suspects; robbery suspects in particular. I mean, the word was out keep your business out of Houston as far as robbery in general, suspects dealing with the Houston Police Department. Is that not right, as far as your being on the force there for those many years? Would you say in general that—

A. Well, I don't know whether I am qualified to answer that. I had heard—

THE COURT: Sir, if you don't know the answers to the question, you can say you don't know.

A. Well, I don't know that to be true, no.

Q. Well, let me say this: The truth is, back in those days things that you had been doing for years and years you wouldn't dare do them today if you was still on the force, would you not?

A. No. No way.

\*   \*   \*   \*   \*   \*

Q. Okay, sir. I ask you if you remember arresting me on the side of the highway, Highway 59, on March 17, 1964. This was on page 53, if you will flip a page back.

A. I remember that without reading it.

Q. Yes, sir. And the record so reflects on page 54, line 3, "I don't remember the date. I remember arresting Calvin Sellars, yes."

Do you recall testifying to that? Is that true?

A. Yes.

\*   \*   \*   \*   \*   \*

Q. Is it not a fact that the manner in which I was arrested on the side of the highway was well calculated and executed on your part and your partner,

Mr. Hodges, to cause surprise, fright, fear and utter confusion on my part; the manner in which my arrest took place?

A. Well, Mr. Sellars, I don't know whether it surprised you or caused you fear. It was a calculated arrest. We were sent out to your place of employment—or not to it, but to wait for you to come out, to leave and we were to arrest you, as we did, and we did arrest you after you came out. We pulled alongside of you and told you to pull over—I did, and you did.

Q. Let me repeat that, Mr. Schallert, so you will understand the question fully.

I am trying to say the reason that my arrest took place on the side of the highway rather than at my job where my employees could see me being arrested, my friends, the reasons for this secret arrest, this clandestine arrest on the said of the highway, this technique employed in arresting me that way, was it not a part of your plan, your scheme, your motive, as far as arresting me that day, to make me realize right off the bat that I was alone, I was in the custody of you and your partner from the moment you pulled me over on the side of the highway?

A. I don't think so, Mr. Sellars. We didn't have a warrant issued for your arrest and I think that is probably the reason we waited for you to leave your place of employment.

As far as being a part of a plot or a plan, I'm not sure that you could consider that either as being true. We didn't take you right down to the police station, as you well know, and as I have testified.

Q. Well, let me ask you this: From the very beginning of arresting me, was it not your desire to get me by myself, to isolate me from all other contact with my co-workers, friends, family?

What I'm talking about the arrest taking place on the highway, that this was a part of your plan, desire anyway, to instill some kind of initial fear in me as far as the arrest, the way it was executed there on the side of the highway without anyone seeing the arrest take place. Can you answer that question, sir?

A. I may have been, Mr. Sellars. We arrested you and intended to find out who the other people were who were involved in the robbery with you.

Q. Well, you knew by apprehending me in that manner that I would immediately realize that my arrest would be unknown to no one, that I would know myself that neither my employer, fellow workers, friends, family, no one in the world would know where my whereabouts were from that moment on the highway at 4 p. m. Is that not a fact?

A. Well, that is probably true.

Q. Let me ask you this Mr. Schallert: Is it not a fact that because you had handled me before on one or two prior occasions, you and your partner both, I believe, that you knew fully well that if you just picked me up, arrested me without, using the language of the vernacular in the streets, coming down hard and heavy on me, that you probably knew that you wouldn't get the time of day out of me and therefore, right off the bat, you knew that if you didn't use some awfully strong tactics, if you didn't put the fear of God in me, so to speak, if you didn't make me believe my life was in your hands and that you could do anything you wanted to me, if you didn't really scare me into believing that I would never see the lights of Houston again if I didn't get my business straight with you; that is to say, fully cooperate with you on my involvement in the Schepps robbery, if you hadn't done these things to me, the manner of the arrest, the way it took place, you knew, you had a pretty good idea that I wouldn't tell you the time of day or even talk to you in that regard on this case. Is that not a fact, Mr. Schallert?

A. That is a fact, yes. I believe that.

Q. Therefore, Mr. Schallert, when you got into my car on the side of the highway, got behind the wheel, you had already made your mind up at that time, your motive for arresting me that way, to do what you thought as a law enforcement officer at that time doing your job, to do what you thought was necessary into initially scaring me and to discussing and talking to you about the Schepps robbery. Is that not correct, Mr. Schallert?

A. Yes, we were able to persuade you to tell us.

Q. Mr. Schallert, is it not a fact that as soon as you got into my car, didn't I want to know what was going on? Didn't I ask you what it was all about?

A. Yes, sir.

Q. I didn't ask you if I was under arrest, what was the trouble, I wanted to know where you was taking me, just what it was all about?

A. Yes, you did.

Q. And is it not also a fact, Mr. Schallert, that you ignored my question by telling me in words to the effect just shut up talking, I would soon find out what it was all about when I got with your partner; that I probably already knew what it was all about anyway. Didn't you tell me these things more or less?

A. That's right. Yes, I did.

Q. What I'm getting at, you refused to talk to me as you drove my car. Did you direct me to shut up asking questions as we go on down the highway? Is that not a fact, sir?

A. That's true.

Q. You didn't tell me anything about a robbery, the Schepps robbery, in fact, not one word about a robbery was spoken while we were both alone in my car as you drove along. Is that not correct?

A. That's correct.

Q. Well, isn't it also the God's truth that after you got behind the wheel of my car and started off down the highway with me, I didn't know where you were taking me, I didn't know where we was going, you just drove and I just looked at you. Is that not true?

A. Yes. You didn't know where I was taking you because I didn't know where I was taking you myself.

\* \* \* \* \* \*

Q. I didn't request that my car be driven over there instead of it being taken to the central police property lot or anywhere else, did I?

A. No.

Q. I didn't request you drive my car anywhere in fact, or park it, hide it, leave it or abandon it at the Cedar Lounge or anyplace else, did I?

A. No.

Q. And this parking my car behind the Cedar Lounge, the secret drive from the point of arrest to the Cedar Lounge, this isolation of me and the hiding of my car there and the parking of my car behind the beer joint, this was not a necessary incident of my arrest on March 17th, is that not a fact?

A. No. As I said, I was driving around looking for a safe place for your car to leave it.

Q. Now, after parking my car behind the Cedar Lounge, you then decided to go back out of town with me, did you not? I mean, instead of taking me on to jail?

A. We did not take you into jail, no. We drove around, but I couldn't tell you where. We drove erratic, maybe just a few areas, we just drove around.

Q. And I didn't ask that you drive me back out of town or drive me back to wherever right now you can't describe and neither can I, which is what I was going to try and use that map for, but I didn't ask you—for you to drive me back out, did I, sir?

A. No, you didn't ask at all.

Q. I didn't have no idea what your intentions were. I didn't know what was going on, what was coming down yet, did I, Mr. Schallert?

A. No.

Q. I mean, you hadn't told me anything on the way from the stop at the highway to the Cedar Lounge, so I didn't request after we arrived at the Cedar Lounge that you drive me around some more in your car after we arrived at the Cedar Lounge, did I not?

A. No.

Q. Mr. Schallert, when we got to the Cedar Lounge, did you not instruct me to get out of my car and place my hands behind my back and put the cuffs there on me at the parking lot of the Cedar Lounge?

A. Yes, sir.

Q. Did you not then instruct me to get in the police car and we left from that location going back out of town—north part of town or wherever it was?

A. I think we stayed out in the north part of town. I told you to get in the floorboard of the police car after I had locked your car up and we drove up.

Q. Mr. Schallert, let me ask you this: I did not have and I did not request that you place me face down, my hands handcuffed behind my back, place me face down on my stomach in the floorboard. I did not request that treatment, did I not?

A. No.

Q. Mr. Schallert, where did you place your feet while I was in the floorboard of the car?

A. On your back legs, I think.

Q. Sir, was not the placing of me in the floorboard of the police car a part of the scheme or the technique to scare me, just another one of the tactics, the manner in which the arrest took place, the isolated, secret arrest on the highway, not telling me what was going on, what it was all about, hiding, parking my car behind the Cedar Lounge, was all this not a part of the scheme to instill fear in me to the extent that I would cooperate with you as to my involvement and what I knew about the Schepps robbery. Is that not a fact?

A. Well, I think, Mr. Sellars, we have physical evidence to show you at the scene, put you at the scene. What we were trying to find out was who the others were, and it was part of whatever you call it to get you to tell us who they were.

Q. After I was placed in the floorboard and could not see anything but the floor, isn't it the God's truth that I didn't know where I was going then for sure. I mean, from the highway, from the point of arrest to the Cedar Lounge I didn't know where I was going, you didn't tell me where I was going, I didn't know what it was about, but after I am in the floorboard of the car I sure didn't know where I was going then, isn't that true?

A. No, I'm sure you didn't.

\*     \*     \*     \*     \*     \*

Q. Well, is it not the truth that you threatened me while I was on the floorboard, words to the effect, telling me something like this: "Calvin, you will never see the lights of Houston again if you don't get your business straight with us. Take a good look at Houston, the Houston lights, as we are going out of town. You won't return if we don't get what we want from you. We will leave your body in a ditch out there somewhere. The crabs might be or might have eaten your"—pardon my language—"your ass up by the time they find you if you don't get your business straight with us on that."

Is that not true, sir?

A. Yes, we told you that. Of course, we didn't intend to carry out any threats, but we did tell you that.

Q. Mr. Schallert, you put me down on the floorboard to scare the hell out of me—

pardon the language again—to start with, then you went ahead and made your threats to really do the trick as far as scaring me, make me believe that I was in your complete control, custody, you could do anything you wanted to me, even though perhaps you had no intentions of carrying it out, as you have just stated, but these things were told to me, were they not?

A. After you kept insisting you didn't know anything about it, yes, we told you.

THE COURT: Excuse me a minute, Mr. Sellars. Let me ask the witness a question.

Officer Schallert, I want to read you two pages of your sworn testimony that you gave before Judge John Onion back when this case was tried.

Starting on page 468, "Question: When you got to the Cedar Lounge, was it there that the defendant was asked to get out of the car?

"Answer: Yes.

"Question: At that time, did you ever handcuff him and push him into the rear of the police vehicle?

"Answer: I don't recall whether he was handcuffed or not. He was not put in the rear of the police car.

"Question: If you did handcuff him, would he have been handcuffed with his hands behind him?

"Answer: I don't think so. I wouldn't have seen any reason. I don't believe we handcuffed him.

"Question: Your best recollection is that you did not handcuff him at all?

"Answer: No, sir, I don't think we did.

"Question: When you finished parking his car at the Cedar Lounge and getting into the patrol car, your testimony is you drove around for some time. Is that correct?

"Answer: Yes, sir.

"Question: At any time while you were driving around after having left the Cedar Lounge, did you tell this defendant that we have got your little brother and he's confessed to this crime?

"Answer: No, sir, I did not.

"Question: At any time did you tell him after having left there that we are prepared to stay three or four days, make it easy on yourself, if you can't endure the punishment and sign a confession, you will never see Houston again and you will find your body in a ditch?

"Answer: No, sir.

"Question: At any time, did Officer Hodges pull any character of a weapon, a pistol or a revolver on the defendant, Calvin Sellars?

"Answer: Not in my presence, no, sir.

"Question: At any time did you tell this defendant we picked you up on your job and nobody knows where you are and you are going to tell us what we want you to say and if you can endure the punishment and won't sign a confession, you will never see Houston again?

"Answer: No, sir.

"Question: At any time, did you take this defendant with his arms handcuffed behind his back and place him on the floorboard of the automobile and have your feet and legs on his back with pressure applied to his back?

"Answer: No, sir.

"Question: Did you ever place him in the floorboard?

"Answer: No, sir."

That takes us down to page 470, line 7. Now, Officer Schallert, it is astounding what has happened here. I cannot reconcile what you are telling me this morning with your sworn testimony back at the time of the trial. Maybe we can just short circuit this right away.

Did you perjure yourself back there, sir, or not?

THE WITNESS: Your Honor, I don't recall, and I didn't purposely—have never purposely perjured myself in any court of law.

THE COURT: Well, how can you reconcile that sworn testimony with the testimony you have given to me here today, sir?

THE WITNESS: I don't know, unless it was the long hours that we were putting in in this case. I put in myself 500 hours of overtime.

\* \* \* \* \* \*

Q. Officer Schallert, is there any way that you can justify or explain the inconsistencies that appear to have come up here today?

A. The only thing—I don't recall anything about my testimony in the previous trial in that regards. If there is a transcript of it, I apparently did. There is some things in there that is true, but for some reason or another, I don't know why, I can't explain it. As I told the judge, I put in 500 hours overtime, plus my regular time on this case and there are some things I just don't remember and there is some things that are completely blanked out now and some things stand out pretty well in my mind.

\* \* \* \* \* \*

QUESTIONS BY MR. SELLARS:

Q. One more time. The initial incommunicado treatment starting with the secret isolated arrest on the side of the highway about 4 p. m., the driving of my car to the Cedar Lounge, putting me in the car, taking off and driving back around the north side and placing me in the floorboard face down hands cuffed behind my back, the interrogation, the threats to me, the threat to me that I would never see the lights of Houston again, my body would be found in a ditch if I don't cooperate and get my business straight with you on this thing, it is your belief that I was involved in the Schepps robbery, all these things occurred, did they not, Mr. Schallert, before I began cooperating with you, is that not the God's truth?

A. Yes, I think so.

Q. In fact, this is going back to what I said, this was the only way that you knew how to deal with me, Mr. Schallert, is it not? I mean, in your own mind Calvin Sellars against the robbery division there in Houston, the method, the means, justifiably so perhaps in your mind back in that time, back in 1964, and this is 1977, doing the things that you had been doing for years and years, or not just you, just not Robert B. Schallert, but the police department, not just the Houston Police Department, but across the nation, not just you but these things you had been doing, this was your way of dealing with Calvin Sellars?

THE COURT: Well, I'm not concerned about that, sir, all I am concerned about is what happened to you.

Q. With dealing with Calvin Sellars then?

A. Sir?

Q. Dealing with Calvin Sellars, this was your way, this was your means in trying to do your job?

A. We believed that if we hadn't done it, you wouldn't have told us anything.

MR. SELLARS: Pass the witness to counsel right now.

\* \* \* \* \* \*

Q. Mr. Schallert, the placing of me in the floorboard of a car, feet on top of my legs, my back and your threats to me, these tactics, was I not put in fear by your acts, by these things done to me? They were effective, were they not?

A. Well, I would imagine. However, I didn't have my feet on your back. If I had them, they were on your legs.

Q. Well—

A. I imagine they did.

Q. Let me ask you—I think maybe—regardless of what I told you after that time, all these things that were done to me, if these things had not been done to me by you, can you state right now whether or not in your own mind you would have got as far as you did?

What I am referring to is getting me to confess, to give you a written statement, none of the things would have taken place?

A. I don't think you would.

MR. SELLARS: I pass the witness, your Honor.

MR. PRENTICE: No further questions.

THE COURT: Mr. Schallert, I just want to make sure I have heard you right, and I am going to have this typed up and read it very carefully before I take any action on this case, but my understanding is that you have admitted here this morning that you took this man, put him on the floorboard of the car, regardless of how much force was involved, you placed your feet on either his back or his legs, and you told him, in effect, that if he didn't cooperate with you he would never see the lights of Houston again?

THE WITNESS: In so many words, yes, sir.

THE COURT: Is that an unfair summary of what you have told me this morning?

THE WITNESS: Except for the fact that I didn't mistreat him physically in any way; neither one of us did, sir.

THE COURT: Okay. You did not mistreat him physically, but you did put him on the floor of the car, put your feet on his legs, drove around and you threatened him that if he didn't cooperate he would never see the lights of Houston again?

THE WITNESS: In so many words, yes, sir.

THE COURT: Did you make any other threats to him besides that?

THE WITNESS: I don't know, your Honor. We drove around for several hours before and after he gave us the confession and several hours after he gave us the confession. We were out with him until the wee hours of the morning.

THE COURT: And your only explanation that you can give me of your testimony that I read to you earlier from the trial is that you were tired?

THE WITNESS: Your Honor, at some points in there we were up three and four days at a time without any rest.

THE COURT: Any further questions for Mr. Schallert?

FURTHER REDIRECT EXAMINATION

QUESTIONS BY MR. SELLARS:

A. Mr. Schallert, let me ask you this here. You took an oath a while ago, sir. Being a policeman, I am sure you know what that oath means, especially in a United States Federal District Court. Will you state for the record have you told the truth today, the absolute truth, the whole truth and nothing but the truth? You have not committed perjury in this Federal Court today, have you?

A. I have not and I have never intentionally perjured myself in any court.

\* \* \* \* \* \*

This Court must reluctantly reach the inescapable conclusion that admission of Sellars' confession at his original trial was based upon the perjured testimony of Officers Schallert and Hodges.

No Court has previously had the opportunity to make this determination. If this Court had been presented with the testimony presented to Judge Onion, the Court would have accepted the testimony of Officers Schallert and Hodges, just as did Judge Onion. The only thing which has enabled this Court to determine apparently for the first time in this amazingly lengthy set of proceedings that the admission of the confession was based upon perjured testimony, is the partially candid testimony of Officer Schallert given on the morning of December 7, 1977.

This Court finds that Officer Schallert's testimony given to this Court on the morning of December 7, 1977 insofar as it relates

to the threats against Sellars is true. This Court finds that the testimony of Officers Schallert and Hodges given before Judge Onion was intentionally perjured and given for the purpose of inducing Judge Onion to allow the introduction of the confession into evidence. This Court finds that the testimony of Schallert and Hodges before the jury was given for the purpose of destroying Sellars' credibility when he testified and obtaining a conviction which otherwise might not have been obtained.

No Court has previously had an opportunity to make this determination for the reason that neither Officer Schallert nor Hodges has previously testified with the degree of candor exhibited by Officer Schallert on the morning of December 7, 1977, before this Court.

Were it not for the partially candid testimony of Officer Schallert on the morning of December 7, 1977, this Court would reach exactly the same conclusion that every other judge who has considered this matter has reached.

The Court has reviewed the entire transcript of the testimony given at the Sellars' trial for the purpose of making certain that the testimony of Officers Schallert and Hodges was truly material to Sellars' conviction. This review of all of the testimony given at trial reveals that the testimony of Schallert and Hodges was the key element in the State's case.

Sellars' defense was predicated on his testimony that he was not involved in the robbery and that at the time of the crime he was visiting his mother's house. His testimony was corroborated by that of his mother, his wife, his brother, and a neighbor. Sellars' explanation for his confession, and for certain alleged oral admissions made during the period when he was under arrest, was that on the evening of his arrest, he was apprehended on an isolated road several miles from his work while on the way home.

He testified that after his car was parked, he was placed face down on the floorboard of the police vehicle with Schallert's feet on his legs or back. He was then told to take a good look at the lights of Houston because if he did not cooperate, he would never see the lights of Houston again and would be left dead in a ditch outside the city. This much of Sellars' trial testimony is now totally corroborated by that of Officer Schallert.

Sellars also testified that after he was taken out of the city, he was subjected to physical abuse. This portion of Sellars' testimony is still in dispute because Officer Schallert still contends that no physical force was ever exerted upon Sellars.

Sellars testified further that after his initial intimidation during the period of his arrest, he was taken to the police station where he was further intimidated and placed in fear of his life. He contends that his confession and all subsequent oral admissions were the result of this intimidation.

Both for the purpose of making Sellars' confession admissible in evidence, and for the further purpose of impeaching him, Officers Schallert and Hodges testified that no threats were ever made of any kind against Sellars.

There was certain physical evidence against Sellars, but it was far from conclusive. The physical evidence was based upon the fact that, shortly after the crime, some work clothes bearing particles of carpet from the victims' home were found in a trash can about fourteen blocks from Sellars' home. In addition to the particles of carpet, the work clothes also had upon them a single human hair. The police chemist testified that this human hair was the same as a human hair taken from Sellars' head after his arrest. Although the police chemist testified that definite identification was possible by hair analysis, upon cross-examination he was confronted with authoritative statements from the applicable literature which contradicted the chemist's testimony and indicated that positive identification could rarely be made upon the basis of a single hair sample.

The case, like many, simply boiled down to a "swearing match" between Sellars and

his family on the one hand and the police on the other. If the jury had known that Schallert and Hodges were perjuring themselves, the result may well have been considerably different. It is virtually certain that if Judge Onion had been presented with the present testimony of Officer Schallert, the Sellars' confession would never have been admitted in evidence.

■ The legal question presented, therefore, is whether the previous proceedings in connection with this matter, none of which involved testimony such as that elicited by former Officer Schallert are res judicata. In common law the principle of res judicata did not apply to habeas corpus proceedings. *Sanders v. United States*, 373 U.S. 1, 7, 83 S.Ct. 1068, 10 L.Ed.2d 148 (1963); *Bearden v. United States*, 403 F.2d 782 (5th Cir. 1968). In 1966, the Congress passed 28 U.S.C. § 2244(b), which states:

"When after an evidentiary hearing on the merits of a material factual issue . . . a person in custody pursuant to the judgment of a State court has been denied by a court of the United States or a justice or judge of the United States release from custody or other remedy on an application for a writ of habeas corpus, a subsequent application for a writ of habeas corpus in behalf of such person need not be entertained by a court of the United States . . . *unless the application alleges and is predicated on a fac-tual or other ground not adjudicated on the hearing of the earlier application for the writ . . . ."*

■ The Court therefore concludes that the unique fact situation created by Officer Schallert's partially candid testimony of December 7, 1977 has never been previously adjudicated, that if Officer Schallert's partially candid testimony of December 7, 1977 had been presented to Judge Onion, the confession would not have been admitted in evidence, and that the perjured testimony of Officers Schallert and Hodges in the trial of this case on the merits was calculated to cause the rendition of an improper judgment. The Court therefore concludes that Calvin Sellars was, in the trial of the case which is the basis of his confinement, denied due process and the equal protection of the laws under the Fourteenth Amendment to the Constitution of the United States, and his writ of habeas corpus was in all things GRANTED on December 15, 1977. That order specified that respondent was given forty-five (45) days, during which time it must make a determination as to whether or not Sellars is to be retried, or re-indicted.

This Court's order of December 15, 1977, which is incorporated by reference herein, granting Sellars' petition for writ of habeas corpus was based upon the reasoning contained in this document.                .

EXHIBIT A

IN THE UNITED STATES DISTRICT COURT FOR THE
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| CALVIN SELLARS | X | |
| | X | |
| vs. | X | CIVIL ACTION NO. 76–H–1897 |
| | X | |
| W. J. ESTELLE | X | |

June 2, 1977

## MEMORANDUM AND ORDER

STERLING, District Judge.

In this application for writ of habeas corpus, petitioner Sellars contends that a discrepancy between a police officer's testimony at petitioner's trial as to the time petitioner was seen signing his confession and the officer's testimony concerning such events at a prior trial of another defendant which was allowed to stand uncorrected, constitutes a denial of due process. More specifically, petitioner argues that his prosecutors knowingly used perjured testimony to obtain his conviction, that this evidence, favorable to petitioner, i. e. the discrepancy, was deliberately suppressed at the time of his trial, and that his court-appointed counsel's failure to note the discrepancy constituted inadequate representation by counsel. On March 31 and April 1, 1977, an evidentiary hearing was held on the merits of petitioner's case, the results of which are as follows:

### FINDINGS OF FACT

1. Petitioner, presently serving a 99 year armed robbery sentence at the Texas Department of Corrections facility at Weldon, Texas, was convicted in Criminal District Court No. 4, Harris County, Texas, on February 23, 1965.

2. Sam Hoover, a co-defendant of petitioner, was tried in July, 1964, for his part in the crime.

3. (a) There is a discrepancy in the Houston Police Officer O. H. Hadley's testimony at the two trials. At petitioner's trial Hadley testified that he first saw petitioner when he witnessed petitioner's signing a statement at about midnight, March 17, 1964, in the robbery division of the Houston Police Station. At the Hoover trial Hadley had previously testified that the first time he saw petitioner was when he witnessed petitioner's signing a statement at about 8:00 P.M., March 17, 1964, in the robbery division of the Houston Police Station.

(b) Contradictorily, petitioner testified at his own trial that he was coerced into signing the confession in the back of a police car behind the North Shepherd Police Substation in the early hours of March 18, 1964, and that he had never seen Officer Hadley until his trial.

4. (a) Mr. Gus Zgourides and Mr. Sam Robertson were the assistant district attorneys who prosecuted both petitioner and Hoover.

(b) Neither Mr. Zgourides nor Mr. Robertson was aware of the discrepancy at petitioner's trial.

(c) The discrepancy in Hadley's testimony was not suppressed at the time of petitioner's trial.

5. (a) Petitioner was represented at trial by two competent court-appointed attorneys, Mr. Rex Emerson and Mr. Howard Lake.

(b) Mr. Lake and Mr. Emerson, proceeding for petitioner in forma pauperis, were not aware of the discrepancy before or during petitioner's trial, had not had any reason to request the Hoover transcript before trial, and had not, therefore, read the Hoover transcript at the time of petitioner's trial.

6. (a) Petitioner was ably represented by Mr. Will Gray on appeal. Mr. Gray commenced his representation of petitioner in the mid-1960's by filing petitioner's first of several applications for writ of habeas corpus after the Texas Court of Criminal Appeals sustained his conviction and death sentence, pursued the task through a lengthy and complex exhaustion of state and federal court remedies and terminated his representation of plaintiff only after the Supreme Court vacated petitioner's death sentence in June, 1972.

(b) In conjunction with petitioner's appellate maze described above, Mr. Gray read all of the Hoover and Sellars records thoroughly. See *Sellars v. Estelle*, 536 F.2d 1104 (5th Cir. 1976).

(c) Mr. Gray raised all the points of constitutional significance that he thought were meritorious and determined that the discrepancy complained of here was imma-

terial to the critical issue of the appeal, which was the voluntariness of petitioner's confession. The validity of that confession has been consistently upheld. *Sellars v. Beto*, 430 F.2d 1150 (5th Cir. 1970), vacated (as to the death penalty only) 408 U.S. 937, 92 S.Ct. 2865, 33 L.Ed.2d 756 (1972).

(d) Finally, Mr. Gray testified at the evidentiary hearing that he has handled hundreds of appellate cases where there were joint or separate trials and has found that there are always conflicts in the testimony.

(e) Petitioner first learned of the discrepancy when he personally obtained the Hoover trial transcript for the first time in 1976.

### CONCLUSIONS OF LAW

1. (a) This Court has jurisdiction under 28 U.S.C. § 2254.

(b) Petitioner has exhausted the remedies available to him in the courts of Texas.

2. (a) Petitioner's prosecutors did not knowingly use perjured testimony to obtain petitioner's conviction.

(b) Evidence favorable to petitioner was not suppressed at the time of petitioner's trial.

(c) Petitioner received effective assistance from his court-appointed counsel at his trial and from Mr. Gray on appeal.

(d) Petitioner has suffered no denial of due process nor of any other constitutional right by the discrepancy in Officer Hadley's testimony going unnoticed and uncorrected at petitioner's trial or on appeal or during efforts to obtain other post-conviction relief.

3. In light of the foregoing, it is hereby ORDERED that petitioner's application for writ of habeas corpus is denied.