## DRAKE *v.* STATE

No. 40287 September 24, 1956 89 So. 2d 593

. Submitted on record.

ROBERDS, P. J.

 Drake, the appellant, was convicted of the forceable rape of Mrs. G. D. Fulmer and sentenced to death. In the trial court he was represented by two local attorneys appointed by the court. He is not represented by counsel on this appeal. No assignment of error, brief or other defensive document has been filed on his behalf. Ordinarily, in such circumstances, the appeal would be dismissed for lack of prosecution. However, in death penalty cases we do not follow that procedure, but proceed to examine the record to determine whether the accused received a fair trial. Shaffer v. State, 46 So. 2d 545 (Miss.) (Not reported in State Reports); Russell v. State, 226, Miss. 885, 85 So. 2d. 585. That is the procedure we are adopting in this case.

On the merits of the case, the State introduced ample testimony to justify the jury in finding the following facts:

. The alleged crime took place at the home of Mrs. Fulmer, the prosecutrix, and her husband, located some three miles west of Durant, Mississippi, about ten o'clock on the night of December 22, 1955. Mr. Fulmer was an

employee of a railroad and he did his work at Durant. His hours of work were from eight o'clock P.M. to five A.M. He usually left his home to go to his work around seven o'clock in the evening. Mrs. Fulmer would then usually be alone. The accused lived about one mile from the Fulmer home. He was familiar with the premises at the Fulmer residence and knew Mr. and Mrs. Fulmer. He also knew that Mr. Fulmer worked at Durant at night and that Mrs. Fulmer, in his absence, would be alone in the home. Accused was about 34 and Mrs. Fulmer was 62 years of age.

On the night of December 22, 1955, Mr. Fulmer went to his work as usual. Mrs. Fulmer was alone in the home. Between 9:30 and 10 o'clock that night Drake showed up at the Fulmer residence. He demanded entrance, which Mrs. Fulmer refused. He then proceeded to use a piece of iron and break down the door. He got into the room and a scuffle took place between him and Mrs. Fulmer. She tried to defend herself. She once got out of the house into the front yard but he dragged her back into the house. Drake threatened to kill her unless she complied with his demands. He did strike her a number of times, causing serious wounds on various parts of her body. He stripped and tore from her body her clothing, especially her underwear. He used vile language and threatened to kill her unless she yielded to his desires. He threw her to the rug and proceeded to rape her. When he had completed this crime he forced her, at the threat of death, to deliver to him some fifteen to twenty dollars. Right after commission of this crime, and before Drake left the house, an automobile appeared in front of the house. Mr. and Mrs. James William Harrison, daughter and son-in-law of Mrs. Fulmer, were in the car. They lived in Birmingham and had driven over to spend Christmas with their father and mother. Mrs. Fulmer, shaken with emotion, cried out to them that she had been raped and robbed and that the guilty party was

yet in the house. Drake then ran out the back of the house. Mrs. Harrison had turned on the yard lights, which Mr. Fulmer had left on when he went to work, but which lights Drake had switched off. Mr. Harrison ran from his car to the back yard and saw Drake running from the house and the yard. Harrison tried to catch Drake but was unable to do so. Drake, as he ran, threatened to shoot and kill Harrison.

Mrs. Harrison immediately called the sheriff, a city policeman and the doctor.

Mrs. Fulmer was carried to the hospital at Durant. She was examined by Dr. Roy Smith. He testified that she was undergoing great shock; that she had numerous cuts, bruises, abrasions and wounds on her body; that he made X-rays, especially of the chest, to determine whether there were any dislocations or broken bones. He also examined her private parts, which were lascerated, torn and bleeding. He found other reasons and evidence, which we do not care to set out, establishing the fact that Mrs. Fulmer had been raped. Mrs. Fulmer remained in the hospital some three days.

The officers came in response to the call of Mrs. Harrison. They found Mrs. Fulmer crying and undergoing intense emotions from the experience she had just suffered. They also found the chairs, tables, etc. thrown about and upturned as the result of the physical contest which had taken place between Drake and Mrs. Fulmer. They noted various wounds and bruises on various parts of Mrs. Fulmer's body, especially in front and about the breast. They found the broken glass door and the iron pipe with which it had been broken. Incidentally, the door and iron pipe were introduced in evidence.

We might add here that Abram Deering testified that his residence was a short distance from that of the Fulmers, and that on the night in question he and his wife were going home from Durant, and that Drake was with

them, and that they separated near the Fulmer home, witness and his wife going to their home.

After making the investigation at the Fulmer home, above mentioned, the officers went to look for Drake. They found him at the home of Betty Stevens. He had his grip packed ready to leave. He was arrested and placed in jail.

On December 24th, after being placed in jail, Drake, according to the State's proof, made a confession of his guilt, which was then reduced to writing by Mr. Pat Barrett, the county attorney, and signed by Drake. This statement gives in detail the movements of Drake and also the details and particulars as to the physical situation at the Fulmer home and the contest with Mrs. Fulmer, before he was able to accomplish his purpose. The description of the physical facts, as given in the statement, correspond with the true facts disclosed by other testimony. For instance, he described knocking down the door with the iron pipe. These were produced and introduced in evidence. It was in evidence that he had threatened to shoot and kill Mrs. Fulmer and her daughter and son-in-law when the latter two appeared in the home. In this statement he said "I told them just as I was leaving 'I'll kill all of you'". He said Mr. Harrison followed and tried to catch him. In other words, the written statement was in every respect supported by the facts disclosed by other testimony. Four of the five witnesses to the written confession testified it was made freely without hope of reward or fear of punishment. The sheriff, one of the witnesses, was ill and could not testify. Two other citizens of the county, one a carpenter and the other a business man, also testified that the confession was free and voluntary.

The accused said that he made the statement as the result of threats of personal violence. That was all the testimony he offered as to that. He was asked if he com-

mitted the crime and he said he did not. That was all of the testimony that he offered on that question.

It is evident, we think, that admission of the confession was not error and that the jury was eminently justified in returning a verdict of guilty on the testimony before them.

As to the instructions, the State got only one. It charged the jurors that if they "* * * believed from the evidence in this case beyond a reasonable doubt that the defendant Mack Drake unlawfully, wilfully, and feloniously did forceably ravish and carnally and unlawfully know Mrs. G. D. Fulmer, a female person, without her consent and against her will, then you may return either of the following verdicts:"

(1) Find the defendant guilty as charged in the indictment, in which case it would be the duty of the court to sentence defendant to death in the gas chamber; or

(2) Find the defendant guilty as charged and fix his punishment at life imprisonment; or

(3) Find the defendant guilty as charged but disagree as to the punishment, in which case the court would sentence defendant to the state penitentiary for life.

This is the usual instruction given in such cases. It has been approved in many cases by this Court, and is in accord with Sec. 2358, Miss. Code 1942 Annotated.

Defendant requested four instructions. The court granted three of them. One request was for a peremptory, which the court refused to grant. Of the three instructions granted, one of them informed the jurors that all twelve of them must be convinced beyond a reasonable doubt of the guilt of defendant and if a single juror had such doubt it was his duty to stand by his convictions and vote for acquittal.

Another instruction told the jurors that all must be convinced of the guilt of defendant beyond a reasonable doubt, and if they were not so convinced they should acquit the accused.

The other granted instruction told the jurors the accused was presumed under the law to be innocent, and that this presumption was a valuable right and not an idle form, and that the burden rested upon the State to overcome this presumption by competent testimony, and if the State did not overcome the presumption by competent testimony or did not meet the burden of convincing all of the jurors by competent testimony that defendant was guilty of the crime beyond a reasonable doubt, then the jury should acquit the accused.

The court properly refused to grant the peremptory instruction. The three granted instructions correctly embodied the law. We find no error in the actions of the learned trial judge in granting or refusing instructions.

In fact, the entire record discloses that the State presented its case with unusual care and fairness.

Affirmed, and November 7, 1956, is set for the date of execution.

All justices concur.