435 So.2d 645 (1983)
Michael Dale LEATHERWOOD
v.
STATE of Mississippi.
No. 53914.
Supreme Court of Mississippi.
May 25, 1983.
Rehearing Denied June 24, 1983.
August 17, 1983.
*647 Wilkins, Ellington & James, Samuel H. Wilkins, James O. Nelson, II, Jackson, for appellant.
Bill Allain, Atty. Gen. by Carolyn B. Mills, Sp. Asst. Atty. Gen., Jackson, for appellee.
En banc.
WALKER, Presiding Justice, for the Court:
This is an appeal from the Circuit Court of the First Judicial District of Hinds County, wherein the appellant, Michael Dale Leatherwood, pled guilty to the capital murder of Albert Taylor and was thereafter sentenced to suffer death upon a jury verdict so finding.
On Friday, August 22, 1980, Jerry Fuson, George Tokman, and the appellant Leatherwood left Fort Polk, Louisiana, for Jackson, Mississippi, in the appellant's car to pick up Fuson's car which had been left in Jackson a week earlier. Fuson agreed to pay all expenses in return for the appellant driving him to Jackson. After they retrieved the car, Fuson revealed that he had only ten dollars for gas money for the two cars to return to Fort Polk, which was insufficient. After being turned away by a military agency for soldiers stranded while on leave, the trio realized that they were in a strange city without enough money for their return trip.
George Tokman devised a scheme to rob a cab driver and Fuson helped plan the details "like a military operation." When the first cab answered the call, Tokman ignored the driver because he felt the driver was too young and strong. After a second call, the unfortunate victim, sixty-five year old Albert Taylor arrived and the trio entered the cab and Tokman gave Taylor an address. When the cab reached the address, Tokman requested the victim to turn off his lights because "he didn't want his parents to know he was coming in late." At this point appellant Leatherwood slipped a rope around the victim's neck in order to subdue him. As the appellant tightened the rope, the victim was either pulled or started crawling over the backseat. An autopsy report later showed that the victim's death was caused by intercranial bleeding suffered from blows to the head. There was conflicting testimony as to whether Leatherwood told Tokman to "stab him." Tokman stabbed the victim three times in the head.
After driving the cab to a darkened alley behind a North Jackson shopping center, the trio robbed the victim of his wallet, two money bags, a flashlight, and a pistol. Later they returned to the scene of the crime *648 after discovering that the appellant had left his barricks' keys in the cab.
The trio netted approximately $11.00 in cash from the robbery and left Jackson early Sunday morning. Tokman cut his hand while stabbing the victim, so they stopped at a hospital in Vicksburg for medical treatment. While Tokman was in the emergency room, Leatherwood and Fuson stole a man's wallet after surreptitiously gaining entry to his home and later used the victim's credit card for gas.
Thereafter, Leatherwood and Tokman committed two robberies of Louisiana merchants within the next five days. Leatherwood was subsequently tried and convicted for simple and armed robbery in Louisiana before his Mississippi capital murder trial.[1]
Leatherwood pled guilty to capital murder but, among other things, argued to the sentencing jury, which was impaneled to consider whether he should be sentenced to life imprisonment or suffer death, that he was under the substantial domination[2] of George Tokman at the time of the robbery/murder and should not be executed.
The jury returned the death penalty after deliberating for one and one-half hours and found the following aggravating circumstances in accordance with Mississippi Code Annotated section 99-19-101 (Supp. 1982):
(1) The capital murder was committed while the appellant was engaged in the commission of a robbery;
(2) The capital murder was committed for pecuniary gain;
(3) The capital murder was especially heinous, atrocious or cruel; and
(4) The capital murder was for the purpose of avoiding a lawful arrest.
On appeal, the appellant raises eleven assignments of error for this Court's review.

PROPOSITION I.

DID THE LOWER COURT ERR IN ALLOWING THE JURY TO CONSIDER THAT THE CAPITAL OFFENSE WAS COMMITTED WHILE THE APPELLANT WAS ENGAGED IN THE COMMISSION OF A ROBBERY, AND THAT THE CAPITAL OFFENSE WAS COMMITTED FOR PECUNIARY GAIN; IN THAT THIS PRACTICE AMOUNTS TO AN IMPROPER "DOUBLING UP" OF AGGRAVATING CIRCUMSTANCES WHICH LEADS TO AN INCONSISTENT AND UNEVEN-HANDED INFLICTION OF THE DEATH PENALTY?
The State of Mississippi presented evidence of several aggravating circumstances as enumerated in Mississippi Code Annotated section 99-19-101(5) (Supp. 1982); including the fact that the capital offense was committed while the appellant was engaged in the commission of a robbery [subsection (d)] and that the capital offense was committed for pecuniary gain [subsection (f)]. The trial court allowed this evidence and through its instructions to the jury specifically allowed the jury to consider those two aggravating circumstances along with others. The jury found these two specific aggravating circumstances along with two others.
Appellant contends that allowing the jury to consider subsections (d) and (f) as two separate aggravating circumstances amount to what has been commonly referred to as "doubling up" or unfairly using those two circumstances as separate circumstances when in fact they both refer to the same aspect of the crime of robbery/murder. He asserts that all defendants accused of robbery/murder start the sentencing proceeding with two aggravating circumstances already *649 on the scales of justice weighing against them, as opposed to other types of felony/murders; and that robbery/murder death penalty sentences are rendered in an inconsistent and uneven-handed manner to those death penalty sentences involving other felony/murders.
The Florida Supreme Court, when confronted with the doubling up problem in robbery/murders said:
The State argues the existence of two aggravating circumstances, that the murder occurred in the commission of the robbery [subsection (d)] and that the crime was committed for pecuniary gain [subsection (f)]. While we would agree that in some cases, such as where a larceny is committed in the course of a rape-murder, subsections (d) and (f) refer to separate analytical concepts and can validly be considered to constitute two circumstances, here, as in all robbery-murders, both subsections refer to the same aspect of the defendant's crime. Consequently, one who commits a capital crime in the course of a robbery will always begin with two aggravating circumstances against him while those who commit such a crime in the course of any other enumerated felony will not be similarly disadvantaged. Mindful that our decision in death penalty cases must result from more than a simple summing of aggravating and mitigating circumstances, [citation omitted], we believe that Provence's pecuniary motive at the time of the murder constitutes only one factor which we must consider in this case. (Provence v. State, 337 So.2d 783, 786 (Fla. 1976), cert. denied, 431 U.S. 969, 97 S.Ct. 2929, 53 L.Ed.2d 1065 (1977)).
However, in Smith v. State, 419 So.2d 563 (Miss. 1982), the same argument was made as is made in the case sub judice, without using the phrase "doubling up", there, this Court said:
Instruction number S-4 allowed the jury to find from the evidence the following aggravating circumstances if any:
1. The capital murder was committed while the defendant was engaged in the commission of robbery;
2. The capital murder was committed for pecuniary gain;
3. The capital murder was especially heinous, atrocious or cruel.

The defendant's position is that the inclusion of the second enumerated aggravating circumstance, i.e., that the capital murder was committed for pecuniary gain, renders the allowance of this instruction reversible error for reason that the same burdened him with "the necessity of overcoming two aggravating circumstances" when he had been "charged with a murder during the course of a single felony." When the Court along with counsel was considering state's instruction number S-4, the following is excerpted from the record:
BY MR. GREGG:
If the Court please, for purposes of the record, I would object to it because I don't think that has been proven beyond a reasonable doubt. I just make that for record purposes.
Obviously the defense objection made a the trial level was not on the same ground here argued, and ordinarily cannot on appeal be ground for reversal upon a different ground from that asserted below. Daumer v. State, 381 So.2d 1014 (Miss. 1980). Nevertheless, we have specifically upheld the instruction now attacked, and we can find no merit to the present argument. Voyles v. State, 362 So.2d 1236 (Miss. 1978); Bell v. State, 360 So.2d 1206 (Miss. 1978). (419 So.2d at 568). (Emphasis added).
Leatherwood did not object to court's instruction 2 at trial when the court was considering the instructions on the ground that it permitted a "doubling up" of aggravating circumstances as now urged. He did not assert the present theory until after the jury verdict was in and he had filed a motion for a new trial.
This came too late. To hold otherwise would allow the trial court to be sandbagged by skillful defense attorneys thus *650 assuring their client a second trial in the event of a death verdict.
In cases where we feel that the asserted error has merit and that it unduly prejudiced the appellant, we may raise it as an apparent error on the face of the record of the Court's own motion. Irving v. State, 361 So.2d 1360, 1363 (Miss. 1978). However, we are not required to do so by court rule or under section 99-19-105 (Supp. 1982) as claimed by the appellant. In this case we are not so persuaded and do not so move. This is consistent with prior holdings where the jury verdict was allowed to stand and similar instructions were approved. Smith v. State, 419 So.2d 563 (Miss. 1982); Voyles v. State, 362 So.2d 1236 (Miss. 1978); and Bell v. State, 360 So.2d 1206 (Miss. 1978).

PROPOSITION II.

DID THE LOWER COURT ERR IN ALLOWING THE JURY TO CONSIDER THAT THE CAPITAL OFFENSE WAS COMMITTED WHILE THE APPELLANT WAS ENGAGED IN THE COMMISSION OF A ROBBERY, IN THAT THIS PRACTICE IS IMPROPER AND LEADS TO AN INCONSISTENT AND UNEVEN-HANDED INFLICTION OF THE DEATH PENALTY?
The appellant contends that it was improper to allow the jury to consider as an aggravating circumstance, that the capital offense was committed while the defendant was engaged in the commission of a robbery. (Mississippi Code Annotated section 99-19-101(5)(d) (Supp. 1982)).
He reasons that since robbery is an element of capital murder, that it should not also be used as an aggravating circumstance as permitted under Mississippi Code Annotated section 97-3-19 (Supp. 1982). The appellant suggests that this causes him to begin the sentencing stage with one aggravating circumstance against him and thus starts at a disadvantage rather than with a clean slate. He argues that the weighing process is already stacked against him before he even gets up to offer anything in mitigation; and that this practice brings us precariously close to the old ways of mandatory, arbitrary statutes condemned in Furman v. Georgia, 408 U.S. 238, 92 S.Ct. 2726, 33 L.Ed.2d 346 (1972).
We do not agree with the appellant's contention. Under our capital murder statute, when an accused is found guilty of capital murder arising out of a robbery, he then becomes subject to a jury finding that he should be executed if the jury feels that the facts justify it. However, his execution is not mandated and the jury may properly find that he should be sentenced to life in prison. They may so find whether the defendant puts on any evidence of mitigating circumstances or not. This is a far cry from the old statute which mandated execution upon conviction of a capital offense.
The appellant's argument that he enters into the sentencing phase of the bifurcated trial with one strike against him is correct in one sense  i.e., if he had not been convicted of a capital offense, there would be no need for the sentencing hearing and he would simply be sentenced to serve a life term. This does not mean though that the procedure is unfair or faulty.
At the sentencing hearing appellant may put on evidence of mitigating circumstances of an unlimited nature pursuant to section 99-19-101(6) (Supp. 1982) and Washington v. State, 361 So.2d 61 (Miss. 1978), so as to convince the jury that he should not be executed.
We are of the opinion that this assignment of error has no merit.

PROPOSITION III.

DID THE LOWER COURT ERR IN ALLOWING THE JURY TO CONSIDER THAT THE CAPITAL OFFENSE WAS COMMITTED FOR THE PURPOSE OF AVOIDING A LAWFUL ARREST?
The State of Mississippi contended that the aggravating circumstance enumerated in Mississippi Code Annotated section 99-19-101(5)(e) (Supp. 1982), was present in this case. Subsection (5)(e) states:

*651 The capital offense was committed for the purpose of avoiding or preventing a lawful arrest or effecting an escape from custody.
The appellant now argues that the trial court, through its instructions, erroneously allowed the jury to consider the circumstance. The jury found that specific circumstance to exist.
The appellant maintains that there was no evidentiary basis for the finding of that circumstance and it thus impaired the fair and nonbiased weighing of the aggravating and mitigating circumstances in this case.
Florida, which has the same aggravating circumstance, F.S.A. § 921.141(5)(e) (Supp. 1982), has interpreted it to mean that:
... an intent to avoid arrest is not present, at least when the victim is not a law enforcement officer, unless it is clearly shown that the dominant or only motive for the murder was the elimination of witnesses. (Menendez v. State, 368 So.2d 1278, 1282 (Fla. 1979)).
In Menendez, a defendant was convicted and sentenced to death for murdering a jewelry store owner while he was robbing it. The Florida Supreme Court affirmed his murder conviction but vacated his death sentence and remanded the case for resentencing by the trial court. The Florida court based its ruling in part upon the improper finding that the murder was committed for the purpose of avoiding a lawful arrest.
Appellant argues that under the State's theory of the case every murder during a felony could be characterized as an attempt to avoid a lawful arrest thus causing another automatic cumulation of aggravating circumstances which would unfairly influence the weighing process by the jury and cause inconsistent and uneven-handed infliction of the death penalty.
In our opinion, the Florida interpretation is too restrictive. Each case must be decided on its on peculiar fact situation. If there is evidence from which it may be reasonably inferred that a substantial reason for the killing was to conceal the identity of the killer or killers or to "cover their tracks" so as to avoid apprehension and eventual arrest by authorities, then it is proper for the court to allow the jury to consider this aggravating circumstance.
The court properly instructed the jury under the facts of this case in this regard because there was testimony by Fuson that there was a discussion between Tokman and Leatherwood during the planning stage of the robbery that they would leave no witnesses.
Therefore, this assignment is without merit.

PROPOSITION IV.

DID THE LOWER COURT ERR IN OVERRULING THE APPELLANT'S OBJECTION TO THE ADMISSION OF THE TWO LOUISIANA CONVICTIONS OF THE APPELLANT FOR ARMED ROBBERY AND SIMPLE ROBBERY?
At the sentencing hearing, the State was allowed to introduce, over defense objection, two prior convictions of the appellant for armed robbery and simple robbery from the State of Louisiana. The purpose was to show the existence of an aggravating circumstance  that the defendant was previously convicted of another felony involving the use or threat of violence to the person. Miss. Code Ann. § 99-19-101(5)(b) (Supp. 1982).
The appellant maintains that this was improper as the crimes and the underlying convictions therefore, were subsequent to the murder for which the appellant was being sentenced.
This Court has ruled that "previously" means previous "to the time of the trial, so that a conviction between the time the capital offense was committed and the time of trial for it may be admitted into evidence as an aggravating circumstance." Jones v. State, 381 So.2d 983, 994 (Miss. 1980); Reddix v. State, 381 So.2d 999 (Miss. 1980). Appellant contends that the opinions in those cases are not clear as to whether the conviction's *652 underlying crime was committed previous to the capital offense, or subsequent to it, and that point is significant. He points out that in the case sub judice, the crimes which resulted in the Louisiana convictions occurred after the capital offense in Jackson and that prior to the capital offense, the appellant had never been in any serious trouble.
We are not impressed by this argument. Crimes committed by a defendant after having committed a capital offense have just as much or more bearing on the question of his character, criminal tendencies, and whether he should suffer the death penalty, as do crimes committed by him prior to having committed the capital offense. Therefore, this assignment is without merit.

PROPOSITION V.

WAS THE SENTENCE OF DEATH RETURNED BY THE JURY EXCESSIVE OR DISPROPORTIONATE TO THE PENALTY IMPOSED IN SIMILAR CASES, CONSIDERING BOTH THE CRIME AND THE DEFENDANT, AND WAS PROSECUTORIAL DISCRETION ABUSED, THUS VIOLATING THE APPELLANT'S DUE PROCESS RIGHTS UNDER THE FIFTH AND FOURTEENTH AMENDMENTS TO THE CONSTITUTION OF THE UNITED STATES?
Appellant asserts that "The sentence received ... here is not only disproportionate and excessive in comparison with his coparticipants, but also in comparison with other cases, including Culberson [v. State, 379 So.2d 499 (Miss. 1979)]... . in Culberson, Pittman, who was an accomplice yet who did not fire the fatal shot, was permitted to plead guilty to manslaughter for which he received fifteen years. Culberson received the death penalty. Here, Tokman, who inflicted the death blow, received the death penalty, and Fuson, an accomplice was, like Pittman, allowed to plead guilty to manslaughter, and received twenty years. But the appellant, an accomplice who like Pittman did not inflict the death blow, was ... sentenced to death. This result is obviously disproportionate to and more excessive than the result in Culberson."
The appellant overlooks the testimony that Leatherwood and Tokman planned not to leave any witnesses and that during the robbery Leatherwood told Tokman to "stab" Taylor, the cab driver. Moreover, there is ample evidence that Leatherwood was attempting to strangle Taylor to death with the nylon rope.
As to the charge of abuse of prosecutorial discretion in that the accomplice Fuson was allowed to plead to manslaughter and receive a sentence of twenty years, we find no abuse of discretion. Prosecutors must be given wide latitude in allowing an accomplice to plead to lesser offenses in exchange for their cooperation in the prosecution of other participants to a crime. Culberson v. State, 379 So.2d at 510 (Miss. 1979).

PROPOSITION VI.

DID THE LOWER COURT ERR IN OVERRULING THE OBJECTIONS TO AND SUBSEQUENT MOTIONS FOR MISTRIAL BASED ON THE ADMISSION OF TESTIMONY CONCERNING OTHER CRIMES OF THE APPELLANT FOR WHICH HE HAD NOT BEEN CONVICTED?
The appellant contends that the trial court's overruling his objection to the State's questions on cross-examination of him with regard to crimes for which he had not been convicted was error in that they fail to fall within any of the exceptions enumerated in Gray v. State, 351 So.2d 1342, 1345 (Miss. 1977). Gray outlines the general rule in Mississippi regarding the admission of unindicted crimes against a defendant:
It is well settled in this state that proof of a crime distinct from that alleged in an indictment is not admissible against an accused. There are certain recognized exceptions to the rule. Proof of another crime is admissible where the offense *653 charged and that offered to be proved are so connected as to constitute one transaction, where it is necessary to identify the defendant, where it is material to prove motive and there is an apparent relation or connection between the act proposed to be proved and that charged, where the accusation involves a series of criminal acts which must be proved to make out the offense, or where it is necessary to prove scienter or guilty knowledge. See, Smith v. State, 223 So.2d 657 (Miss. 1969), cert. denied, 397 U.S. 1030, 90 S.Ct. 1274, 25 L.Ed.2d 542 (1970); Cummings v. State, 219 So.2d 673 (Miss. 1969), cert. den. 397 U.S. 942, 90 S.Ct. 954, 25 L.Ed.2d 122 (1970).
The appellant argues that allowing questions concerning these two crimes committed in Vicksburg (the theft of a man's wallet and the charging of gas on the murder victim's credit cards) after the robbery/murder had been committed in Jackson was error because neither crime established a continuous transaction, motive, a common plan or scheme, the appellant's identity or guilty knowledge. Consequently, the appellant contends they only served to inflame and prejudice the jury.
At trial, the appellant attempted to establish through his own testimony, that he was under the "substantial domination of another person" (Tokman) and this should serve to mitigate his involvement in the robbery/murder of Albert Taylor.[3] Leatherwood testified initially that every crime he was involved with in Mississippi and Louisiana was committed because he was scared into it by George Tokman. The State attempted to rebut Leatherwood's testimony by showing that while Tokman was in the Vicksburg Hospital receiving medical treatment for a knife wound suffered during the robbery/murder, that Leatherwood could have called the police or at least left Tokman in Vicksburg. Instead, Leatherwood and Fuson committed the other two crimes. (Leatherwood and Fuson were never indicted or tried for these crimes). The State contends that this proves Leatherwood's criminal intent and state of mind and rebuts any argument that Leatherwood was under the substantial domination of George Tokman. We have stated in the past that ordinarily, in a criminal prosecution, evidence of offenses other than charged in the indictment are not admissible. However, there are exceptions to this rule, such as when the defendant opens the door or otherwise invites the State's reference to the crimes as was done in the case sub judice.
We are of the opinion that the appellant opened the door and invited reference to the Vicksburg crimes by his testimony during the sentencing hearing to the effect that he was substantially dominated by Tokman and that this fact should be considered in mitigation by the jury. Appellant admitted on cross-examination that the two Vicksburg crimes for which he was never convicted were committed by Fuson and himself while Tokman was being treated at the Vicksburg Hospital and perpetrated without Tokman's knowledge. It was therefore proper during the sentencing hearing for the State to cross-examine the appellant Leatherwood with reference to the two occasions for the purpose of rebutting Leatherwood's claim, and the court did not err in overruling appellant's objections to the questions with reference to them.
Secondly, the appellant argues that a mistrial should have been granted because Jeffrey Booth, an army buddy of the appellant's, testified that Leatherwood and Tokman discussed that they would have to kill Fuson because "If he gets caught, he will talk." The appellant contends that the above mentioned statement suggests a conspiracy to commit murder which is a separate offense and therefore inadmissible because it could only serve to prejudice and inflame the jury. In our opinion this testimony was admissible for the purpose of showing that Leatherwood not only lacked *654 remorse[4] for his participation in the killing of the cab driver but that he was willing to kill again for the purpose of covering up the original slaying. The jury had the right to consider this evidence in deciding his punishment and the court did not err in its admission into evidence.

PROPOSITION VII.

DID THE LOWER COURT ERR IN DENYING THE APPELLANT'S MOTION TO QUASH THE JURY PANEL ON THE GROUNDS THAT MISSISSIPPI STATUTORY LAW SYSTEMATICALLY EXCLUDES FROM THE VENIRE THOSE REGISTERED VOTERS BETWEEN THE AGES OF EIGHTEEN (18) AND TWENTY (20) YEARS OLD INCLUSIVE?
This assignment of error is without merit. Mississippi Code Annotated section 13-5-1 (1972) which excludes citizens under the age of twenty-one years has been upheld in Joyce v. State, 327 So.2d 255 (Miss. 1976) and Johnson v. State, 260 So.2d 436 (Miss. 1972).

PROPOSITION VIII.

DID THE LOWER COURT ERR IN DENYING THE APPELLANT'S CHALLENGE FOR CAUSE AGAINST TWO VENIREMEN ON THE GROUNDS THAT THEY FAVORED THE DEATH PENALTY?
The two veniremen, Robert Nations and Mary Garrett, indicated that they had strong views in favor of the death penalty. After the court overruled appellant's challenge to the jurors, appellant used two of his peremptory challenges to strike them.
We have carefully considered the questions propounded to and responses of Nations and Garrett and are of the opinion that the trial court's ruling was in full compliance with Witherspoon v. Illinois, 391 U.S. 510, 88 S.Ct. 1770, 20 L.Ed.2d 776 (1968). When questioned by counsel both jurors said that they could put aside their personal feelings, follow the law and instructions of the court and return a verdict based solely upon the law and the evidence and not vote for the death penalty unless the evidence warranted it.

PROPOSITION IX.

DID THE LOWER COURT ERR IN ADMITTING THE ROPE OFFERED BY THE STATE, OVER THE OBJECTION OF APPELLANT'S COUNSEL AND IN ALLOWING THE ROPE DEMONSTRATION WITH THE APPELLANT?
The appellant notes that under Coleman v. State, 378 So.2d 640 (Miss. 1979), the State is limited to presenting evidence during the sentencing phase which is relevant to one or more of the eight enumerated aggravating circumstances outlined in Mississippi Code Annotated section 99-19-101(5) (Supp. 1982). Consequently, the appellant fails to see how the admission of the rope into evidence could be relevant to any of the eight aggravating circumstances. The appellant also argues that the State's in-court demonstration by the appellant showing the jury how he used the rope to subdue the driver, was calculated solely for the purpose of prejudicing and inflaming the jury.
We do not agree with the appellant's application of the law as announced in Culberson to the facts of this case. Jerry Fuson testified that Exhibit 12 (rope) was the rope that Mike Leatherwood used to "strangle" the cab driver, thus, its admission into evidence was not only proper, but relevant to the manner in which the robbery occurred.
In our opinion the demonstration before the jury of the appellant's use of the rope was relevant to the question of whether the killing was done in an "especially heinous, atrocious or cruel manner." Jerry Fuson testified that Leatherwood "threw the rope around his neck and jerked him up and halfway over into the backseat" and held the rope around the victim's neck for several *655 minutes. Fuson also testified that the victim still had a pulse, but Leatherwood held the rope tight declaring that nobody could have lived through having that kind of jolt to his neck. It was within the jury's province to find this aggravating circumstance as instructed by the court and the appellant's demonstration was not prejudicial. Further, we note our recent ruling in Hezekiah Edwards v. State (Miss. 1983) (No. 53,800, decided 1983), that the terms "especially heinous, atrocious and cruel," Mississippi Code Annotated section 99-19-101(5)(h) (Supp. 1982), are proper without further definition for a jury and constitutional in light of the plurality opinion in Godfrey v. Georgia, 446 U.S. 420, 100 S.Ct. 1759, 64 L.Ed.2d 398 (1980). See also Washington v. State, 361 So.2d 61 (Miss. 1978).

PROPOSITION X.

DID THE LOWER COURT ERR IN ADMITTING CERTAIN PHOTOGRAPHS OFFERED BY THE STATE OVER THE OBJECTIONS OF THE APPELLANT'S COUNSEL?
The appellant again relies on Coleman to show the limitations of presenting evidence during the sentencing phase which must be relevant to one of the eight aggravating circumstances of Mississippi Code Annotated section 99-19-101(5) (Supp. 1982). The appellant contends that since he pled guilty to the robbery/murder that any of the pictures of the victim are cumulative and prejudicial because the victim's death is not in question.
We have repeatedly held that the competency, relevancy and materiality of photographs are solely within the discretion of the trial judge who will determine their evidentiary purpose and value. See Bullock v. State, 391 So.2d 601 (Miss. 1981); Reddix v. State, 381 So.2d 999 (Miss. 1980); Voyles v. State, 362 So.2d 1236 (Miss. 1978).
We note especially our rule in Coleman, 378 So.2d at 648-49 (Coleman was affirmed on the guilt phase but reversed and remanded for a life sentence) where we stated on this same question:
The two pictures complained of were color photographs showing where the shotgun pellets hit the victim on the right side of his head, his lower right arm, and on the left side of his chest.
The trial court's ruling was that the state was entitled to introduce these two pictures to support its burden of proving that the offense was "especially heinous, atrocious or cruel." The trial court also granted a jury instruction, over defense objections, that the jury could consider the aggravating circumstance that the offense was especially heinous, atrocious or cruel.
The admission of the two pictures on this basis was not error, as they had some probative value along this line of reasoning.
We find that the pictures were relevant as to whether the crime was "especially heinous, atrocious or cruel" and whether the murder was committed during the course of an armed robbery. There is no merit in the appellant's argument.

PROPOSITION XI.

IS THE IMPOSITION OF THE DEATH PENALTY IN THIS CASE, UPON ONE WHO NEITHER TOOK LIFE, ATTEMPTED TO TAKE LIFE, NOR INTENDED TO TAKE LIFE, INCONSISTENT AND IMPERMISSIBLE UNDER THE EIGHTH AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION?
The appellant's last assignment of error is based on the argument that the rendering of the death penalty for a murder he did not commit nor attempt to commit, nor intended to commit, is inconsistent with the Eighth and Fourteenth Amendments of the United States Constitution. The appellant's argument is based on the recent United States Supreme Court decision of Enmund v. Florida, ___ U.S. ___, 102 S.Ct. 3368, 73 L.Ed.2d 1140 (1982) wherein the Court held that the death penalty may not *656 be imposed upon a "non-triggerman" unless there is proof that the defendant killed, attempted to kill, or intended to kill the victim. In Enmund, the Court reversed a decision of the Florida Supreme Court which upheld the death penalty for Enmund who had been indicted for the first degree murder and robbery of an elderly couple who were known to carry large amounts of cash.
The Florida Supreme Court and the United States Supreme Court each recounted slightly differing versions of the facts with the central difference being outlined in a footnote to the opinion:
The Florida Supreme Court's understanding of the evidence differed sharply from that of the trial court with respect to the degree of Enmund's participation. In its sentencing findings, the trial court concluded that Enmund was a major participant in the robbery because he planned the robbery in advance and himself shot the Kerseys. [Enmund v. State] 399 So.2d, [1362] at 1372. Both of these findings, as we understand it, were rejected by the Florida Supreme Court's holding that the only supportable inference with respect to Enmund's participation was that he drove the getaway car. The dissent, while conceding that this holding negated the finding that Enmund was one of the triggermen, argues that the trial court's finding that Enmund planned the robbery was implicitly affirmed. Post, at [3374]. As we have said, we disagree with that view. In any event, the question is irrelevant to the constitutional issue before us, since the Florida Supreme Court held that driving the escape car was enough to warrant conviction and the death penalty, whether or not Enmund intended that life be taken or anticipated that lethal force would be used. (___ U.S. at ___ n. 2, 102 S.Ct. at 3371 n. 2, 73 L.Ed.2d at 1145 n. 2 (1982)).
However, we find that the case sub judice does not fall within the holding of Enmund. Enmund did not participate in the actual robbery nor was he present when the murder was committed  he was waiting in the getaway car. Michael Leatherwood, like Enmund, participated in the planning of the crime. The difference is that Leatherwood was also present and involved in the execution of the robbery/murder of Albert Taylor by throwing a rope over his head and pulling it tight with such force that the victim was jerked into the backseat. Leatherwood held the rope tight and told Tokman to "stab him" even as the victim was being subdued.
Though Leatherwood testified he never believed the robbery would be carried out and certainly never intended to kill the victim, this Court cannot believe that one who attempts to strangle his victim into submission to the point of unconsciousness and tells his accomplice to "stab him" does not intend to or attempt to kill. The appellant's actions spoke louder than his words.
Though Michael Leatherwood was not the "triggerman", he planned, schemed, and ultimately physically subdued the victim by choking him with a rope, while another stabbed and bludgeoned the victim to death. These are hardly the facts upon which Enmund was decided by the United States Supreme Court and thus we find that the appellant's argument is not persuasive, and we find no merit in this assignment of error.
We have reviewed the record and compared it with all of our decisions subsequent to Jackson v. State, 337 So.2d 1242 (Miss. 1976) involving the death penalty. Some have been affirmed and some reversed. After such comparison, we conclude that the death penalty here is not excessive in the light of the aggravating and mitigating circumstances. We further find that the infliction of the death penalty on Michael Dale Leatherwood is not disproportionate, wanton or freakish when compared to cases involving similar crimes, the facts surrounding them and the defendants.
We also find that the sentence of death was not imposed under the influence of passion, prejudice or any other arbitrary factors, and, that the evidence overwhelmingly supports the jury's finding of statutory *657 circumstances in that the capital murder was committed while the defendant was engaged in the commission of the crime of robbery, that the defendant committed the capital murder in an especially heinous, atrocious and cruel manner. The capital murder was committed for pecuniary gain and was committed for the purpose of avoiding a lawful arrest. The execution of Leatherwood will be consistent and even-handed in the light of all post Jackson death penalty cases considered by this Court.[5]
The judgment of the lower court is affirmed and Wednesday, July 13, 1983, is set as the date for execution of the sentence and infliction of the death penalty in the manner provided by law.
WALKER, P.J., PATTERSON, C.J., BROOM, P.J., and ROY NOBLE LEE, BOWLING and PRATHER, JJ., concur.
HAWKINS and DAN M. LEE, JJ., dissent.
ROBERTSON, J., dissents.
HAWKINS, J., specially concurring to Justice ROBERTSON'S dissent.

APPENDIX "A"
DEATH CASES AFFIRMED BY THIS COURT:

Pruett v. State, 431 So.2d 1101 (Miss. 1983) (No. 54,000, handed down February 23, 1983).

Gilliard v. State, 428 So.2d 576 (Miss. 1983).

Evans v. State, 422 So.2d 737 (Miss. 1982).

King v. State, 421 So.2d 1009 (Miss. 1982).

Wheat v. State, 420 So.2d 229 (Miss. 1982).

Smith v. State, 419 So.2d 563 (Miss. 1982).

Edwards v. State, 413 So.2d 1007 (Miss. 1982).

Johnson v. State, 416 So.2d 383 (Miss. 1982).

Bullock v. State, 391 So.2d 601 (Miss. 1980).

Reddix v. State, 381 So.2d 999 (Miss. 1980).

Jones v. State, 381 So.2d 983 (Miss. 1980).

Culberson v. State, 379 So.2d 499 (Miss. 1979).

Gray v. State, 375 So.2d 994 (Miss. 1979).

Jordan v. State, 365 So.2d 1198 (Miss. 1978).

Voyles v. State, 362 So.2d 1236 (Miss. 1978).

Irving v. State, 361 So.2d 1360 (Miss. 1978).

Washington v. State, 361 So.2d 61 (Miss. 1978).

Bell v. State, 360 So.2d 1206 (Miss. 1978).
DEATH CASES REVERSED AS TO PUNISHMENT AND REMANDED FOR RESENTENCING TO LIFE IMPRISONMENT:

Hezekiah Edwards v. State, (Miss. 1983) (No. 53,800, handed down March 16, 1983).

Coleman v. State, 378 So.2d 640 (Miss. 1979).
HAWKINS, Justice, dissenting:
In the circuit court Michael Dale Leatherwood pled guilty to capital murder. The only issue before the trial jury was whether he would be sentenced to life imprisonment or death.
This is the only issue before us.
The Legislature has not only authorized, but has also made it our responsibility to "consider the punishment as well as any errors enumerated by way of appeal" in a death penalty case. This "sentence review shall be in addition to direct appeal." Upon such review this Court is given the authority, aside from any trial court errors or even in the absence of error, to either affirm the sentence, or remand the case to the circuit court for sentence to life imprisonment. Miss. Code Ann. § 99-19-105 (Supp. 1982).
This narrow discretion granted us is as powerful as it is unusual. The Legislature has said: The Mississippi Supreme Court, as well as the trial jury, is given the discretion of determining whether the accused should *658 be put to death or sentenced to life imprisonment.
The constitutionality of this extraordinary appellate review is not challenged. Our sole function is to determine its application.
I do not propose to denigrate this awesome responsibility by ignoring the authority given us to set aside the death sentence when I am convinced the case warrants setting the death sentence aside, any more than I propose to abuse the authority by reckless utilization.[1]
It is through this narrow aperture that I propose to view this case.
Michael Dale Leatherwood was born February 16, 1962. As far as the record reveals, his life was essentially uneventful until the crime of August 24, 1980, and the series of crimes for four days following. We might note his mother testified he was born out of wedlock, and as a baby she gave him to his father and his wife at the time for adoption. The adoptive mother died soon thereafter of cancer, and Mrs. Leatherwood married Jerry Leatherwood, the natural father. Whether the son ever knew this prior to his trial is not disclosed. Further, as a youth he received several speeding tickets, and once got into a speeding chase with a local law enforcement officer of Louisiana, and was fined $250-350. Finally, he quit school a few weeks before graduating.
Other than these events, there is absolutely nothing in the record to set Michael Dale Leatherwood apart from thousands of other boys across this country.
He was born and reared in Louisiana. His father, in the insurance business, travels for a living. His mother is a housewife. His parents live on a small farm, and have cows and chickens. He belongs to the Presbyterian Church, helped clean his church, and washed cars on Saturdays as one of his church activities. He was considered "tenderhearted." His school grades were in the "A's and B's." He was in the school chess club, and worked while attending school.
Three weeks before he was to graduate, he quit high school in April, 1980, and joined the United States Army. His mother thought he had a disappointing love affair, and his school principal and parents tried without success to dissuade him from quitting school.
His short military record was likewise uneventful. He caused no problems as a soldier.
After basic training in Fort Jackson, South Carolina, he was assigned to Fort Polk, Louisiana, not far from his home.
Except for his two acquaintances, about whom I will presently note, what is above stated is all the record tells us about Michael Dale Leatherwood prior to August 24, 1980. It would have been preferable had this record revealed a great deal more about his life. Only his parents and his company commander gave any information about his lifestyle, environment, and character. No teacher, school principal, family friend, or person who knew him as he grew up testified. The defense chose not to call any such witnesses. Indeed, for reasons best known to the parents and defense counsel, the record is silent on whether he has any brothers or sisters.
While stationed at Fort Polk, he became acquainted with George David Tokman and Jerry Fuson. About two weeks before August 24, 1980, Fuson told Michael his car was in Jackson, and needed Michael to drive him over to Jackson to get it. The trade was that Fuson would furnish the gas needed for the trip. Tokman accompanied them on the trip.
As stated in the majority opinion, when they got to Jackson on Saturday, August 24, 1980, and got Fuson's car started, Fuson only had $10, not enough money to purchase *659 sufficient gasoline to get either car back to camp. Fuson tried to get financial assistance from a military service called "Comfort Pay," but was told by a sergeant they were ineligible because they were not in Jackson on leave. Another military aid called "Manpower" was likewise unavailing because it was after 5:00 p.m., and the office was closed.
Tokman, the "tough guy" of the trio, suggested they rob a taxi driver. This robbery and murder are sufficiently detailed and need no repetition. Michael Dale Leatherwood participated in the homicide by throwing a rope around the elderly taxi driver's neck when he had the cab stopped. Tokman and Leatherwood were on the back seat, and after Leatherwood threw the rope around the driver's neck, the driver turned to climb over into the back seat. It was then that Tokman stabbed him to death with a knife.
Tokman wounded himself in the stabbing, and got treatment in Vicksburg. While being treated, Leatherwood and Fuson forged the credit card of the taxi driver and stole a wallet. The trio returned to Louisiana and went by the Leatherwood home. While in Beauregard Parish, Louisiana, where his home was located, Michael Dale Leatherwood aided Tokman in the commission of a robbery in a Dollar Store in the small community of Merryville, where Leatherwood had attended junior high school and was obviously well known. He and Fuson also assisted Tokman in the robbery of a motel in Lake Charles, Louisiana. They returned to Fort Polk on Thursday, August 26, 1980. The next day they were arrested, and Leatherwood gave a full confession to law enforcement officers.
He was tried in Louisiana for the robberies and sentenced to six and fifteen years without parole.
Why does a young man of 18, whose life was uneventful, suddenly become embroiled in such brutal, senseless, and bizarre episodes? Here is what Leatherwood said:
I felt several things. I felt ashamed that I did them. I feel sorry for the victims, both Mr. Jackson (sic) Taylor and the people that were involved in the armed robberies. I feel sorry for what I have done to my parents. I have wrecked almost totally everything they ever worked for. Everything they ever tried to make me believe in, in the space of a few days, I totally destroyed it. I have destroyed their home. I have put an extreme mental and financial burden on them and I have made them lose confidence in me. Everything that they had done from the time I was a little kid until then, that, in a space of those few days, it was as if it was a piece of paper to me and I had wadded it up and thrown it away.
I do not minimize the terrible act of murder of Albert Taylor, or try to explain the reason Michael Dale Leatherwood was a participant. His vacillation or refusal to say "no" when Tokman suggested a robbery, the insidious progress of the plot and Leatherwood's being led further, step by step, to what he claims he hoped would only be a robbery, and his actual participation in the gory crime, presents a weak or flawed character, one which would challenge the most creative talent of literature, or perceptive mind of psychiatry to reveal.[2]
From this record, Leatherwood's character is as uncharted as Wilde's condemned man in "The Ballad of Reading Gaol":
I never saw a man who looked With such a wistful eye
Upon that little tent of blue Which prisoners call the sky, ...
We can observe that after the murder there was no looking or turning back for Leatherwood, which he apparently knew.
I grieve for the family of Mr. Taylor, an innocent, harmless, good citizen. If I thought putting Leatherwood to death would save the life of a single person, my view would be altered.
Is it wrong to also grieve for the parents of Michael Dale Leatherwood, who did the *660 best they could to give him a Christian rearing, to see that he grow into a worthwhile, useful citizen of this great land? Can we give these permanently disgraced parents no consideration whatever? Or, the thousands of other mothers, fathers, brothers, sisters across this great nation, who each night kneel beside their beds and pray for an errant son or brother?
Is it in the best interest of society to take his life?
When a young man, in truth no more than a boy, has led a good life, comes from good parents, and who one day for some profoundly strange reason acts in a manner violently contrary to the previous 6,000 days of his existence, is our only answer: put him to death?
Can anyone say putting him to death is better for society than condemning him to life imprisonment? Does the majesty of our law demand we put him to death?
As an individual, each member of this Court is painfully cognizant of his fallibility, prejudices, weaknesses, and human frailties.
As the highest Court in this state, however, we have the solemn and unique responsibility to express the hope and aspiration of all our people for a just and humane state. We must be willing to say the unpopular when it needs saying. We must search for the wise, not simply the popular answer. We each know this. And further, if we are to preserve the confidence of the people in our institution for the future, there must be a public confidence that members of this Court can give no thought to our personal consequences, but only to that which in our best judgment should be done with a case. It can and will be said we have made a mistake. It should never be said we failed to do our best.
Of all public officials it should especially be said of a judge, upon whom the people have the right to rely, that when the heat is applied, he is not going to exit the kitchen.
Everything I know as a man, and whatever knowledge I possess as a lawyer and a judge, tells me that society has a better answer than putting Michael Dale Leatherwood to death.
As a justice on this Court, I have the obligation to express this view.
From whence comes the notion that sentence to life imprisonment is not in itself a terrible punishment? Are we required in this case to inflict the very worst sentence a society is empowered to impose in any case?
I would adjudicate, which is the only authority this Court has in this case, to remand to the circuit court for sentence to life imprisonment.
DAN M. LEE, J., joins this dissent.
ROBERTSON, Justice, dissenting:

A.
At his sentencing trial Defendant Michael Dale Leatherwood asked that the jury be instructed as follows:
JURY INSTRUCTION NO. 25
"You are instructed that you need not find any mitigating circumstances in order to return a sentence of life imprisonment."
The Circuit Judge refused the instruction.[1]
Without doubt the jury at the sentencing phase had the complete and unreviewable power to sentence Michael Leatherwood to life imprisonment, no matter how great the aggravating circumstances nor how lacking the mitigating circumstances. In refusing to grant Instruction No. 25, however, the trial court in effect ruled that the jury must not be allowed to know that it has this power.[2] I find it anomalous indeed that *661 such matters should be kept secret from the jury, particularly when a life is at stake.[3] I would reverse and remand for a new sentencing phase trial.[4]

B.
Constitutionally, a state may not limit the circumstances or factors that may be considered in mitigation of punishment at the sentencing phase of a capital murder trial. Lockett v. Ohio, 438 U.S. 586, 608, 98 S.Ct. 2954, 2966, 57 L.Ed.2d 973 (1978); Eddings v. Oklahoma, 455 U.S. 104, 102 S.Ct. 869, 71 L.Ed.2d 1 (1982).
The sentencing phase is far more than a mere evidentiary hearing. It is a hearing before a jury the sole and only purpose of which is to determine whether or not the defendant will be put to death. To be sure, evidence may be taken and facts considered. Aggravating circumstances are weighed against mitigating circumstances and vice versa. Yet we kid ourselves and exhibit a cheapened sense of humanity if we pretend that facts are what  and all  that ought be important at sentencing.
The awesome decision with which the sentencing jury is charged necessarily implicates our most fundamental notions of the uniqueness and dignity and worth of a human being. To many these notions have strong religious and theological undergirdings. Others are guided by resort to secular ethics. The juror's sense of justice and fairness is always tested.
At sentencing both lawyers, the defendant and witness are entitled to discuss, from the most philosophical level to the most practical, the question of life or death. The prosecution is entitled to argue for the death penalty on grounds of punishment, deterrence, retribution and its perceived necessity for societal vengence. The defense is likewise permitted to urge the sparing of the life of the defendant for reasons normally considered outside the legitimate concerns of the positive law, reasons such as mercy, sympathy, forgiveness and human decency.
These and other non-fact questions are necessarily a part of the sentencing inquiry. No doubt each juror must act according to his own conscience. Yet, any juror who eschewed such considerations would be deserving of society's contempt.

C.
Against this backdrop, surely two things are obvious. First, the jury should be instructed that it is not required to find any mitigating circumstances in order to return a sentence of life imprisonment. Second, defense counsel is entitled to argue  in mitigation of sentence  any consideration remotely *662 relevant to the question whether the defendant should live or die.

D.
Via Instruction No. 25, Defendant Leatherwood sought to invoke one of the fundamental premises of the right of trial by jury in criminal cases. No matter what the Crown says about the accused, the jury can always say, No. No matter what laws are passed, no matter what acts are made criminal, the jury can say, No. And give no reason. And the defendant cannot be tried again.
There is no directed verdict of guilty in a criminal case. It matters not how overwhelming the evidence of guilt, nor how complete the confession. The defendant's right to acquittal and freedom is absolute if the jury chooses  for whatever reason  to ignore that evidence and that confession. And if the defendant has this right, he is entitled to have the jury so informed. Under our process, juries are informed of their powers, their duties, and of the rights and burdens of the parties, by way of instructions. This is what Leatherwood sought here.
Jury nullification has been a part of our system of criminal justice for hundreds of years  a fundamental raison d'etre of the system itself, one of those rights of free Englishmen that we Americans fought a revolution to secure. The state can seek unjust punishments. The state is fallible.[5] And so a last measure of protection, protection against the state's fallibility, is built into our criminal justice system. The right and power of a jury to say, No!, this man may not be put to death. Jury nullification is an accepted and unreviewable power where mere liberty is at stake. How much more vital it becomes when life itself is the *663 issue. And how much more Michael Leatherwood was entitled to have the jury instructed correctly regarding its powers and, beyond that, to have his lawyer argue that the jury should exercise its powers.[6]
The Mississippi Legislature had the power to enact a carefully drawn guided discretion capital murder statute. Gregg v. Georgia, 428 U.S. 153, 96 S.Ct. 2909, 49 L.Ed.2d 859 (1976) says so much. The State of Mississippi had the power to invoke that statute and charge Michael Leatherwood in an indictment. And upon Leatherwood's guilty plea to the charge of capital murder, the state had the right to require that Leatherwood go before a jury where it could demand that he be put to death. If done in conformity with the Constitution and law, all of this the state may do.
But when the state demands that the jury return the death sentence, it still must face the power of jury nullification. And if the jury has the power of nullification, it is entitled to know that it has that power. Michael Leatherwood was entitled to have the jury know that it had the power of nullification. And if he was entitled to have the jury know of that power, he was entitled to have the jury so instructed.
We are aware that many, insensitive to the history of our country and our system of law, may take exception to what we write here. All of us are frustrated, frequently angered, that violent crime seems so beyond our power to control. We are inclined to cut corners. We forget our heritage. Be all of that as it may, it is much too late to doubt the wisdom of the many protections afforded those accused of crime. Plagiarizing Judge Learned Hand, to many this is and always will be folly; but upon it we have staked our all.[7]
In spite of all of the constitutional and procedural safeguards, the state may be wrong. In spite of the most deliberate exercise of its lawmaking powers, the state legislature may be wrong when it authorizes capital punishment in a particular case of class of cases. Despite the presence of abundant circumstances declared aggravating by the positive law, despite the total absence of any circumstances legally deemed mitigating, there may be non-fact considerations which render it clear beyond a reasonable doubt that a defendant's life should be spared. The architects of our legal system understood these premises. And that is why they built into our system the venerated power of jury nullification.
Instruction No. 25 should have been granted.

E.
I have read Justice Hawkins' dissenting opinion and have re-read my own. Mine is polemics. His is poetry. I was about to join Justice Hawkins `till I remembered that Keats and Whitman had no co-authors.
HAWKINS, Justice, specially concurring to Justice ROBERTSON'S dissent:
For the reasons stated in my dissents in King v. State, 421 So.2d 1009 (Miss. 1982), and the recent case of Hill v. State, 432 So.2d 427 (Miss. 1983), I fully concur that the circuit judge should have granted instruction number 25 which would have given the jury the unfettered discretion to determine whether Leatherwood should have been sentenced to life imprisonment or death.
I am uncomfortable in the manner this issue is addressed in this case by Justice Robertson. The issue was never presented to or addressed by this Court in the majority opinion. Counsel for Leatherwood made no complaint on appeal of the refusal of the circuit judge to grant this instruction.
While it is no doubt true appellate courts have upon occasion rendered landmark decisions on an issued addressed by them sua *664 sponte,[1] I am not prepared for any such obligation, explicit or implicit, on the part of this Court.
This case is of ultimate importance to the accused. At the same time, we are not strangers to the many civil and criminal cases in which our decisions have the broadest possible impact throughout the state. I simply do not have the physical or mental resources to say, or imply, to any litigant that I will search the record for errors which are not even intimated top, side, or bottom by their lawyers. If we comb a record for errors in this case, are we obligated to do so in every case?
Standards of review should be applied evenly and with articulated reasons for their application. To do otherwise will, in my respectful view, breed uncertainty and confusion, from which there will inevitably fester hypocrisy as well as contempt. Litigants will know the cases in which we have found some non-assigned error, because our opinions will call them to the attention of the parties. But what about all the remainder of the cases? How can litigants ever know the cases in which we ignore sub silentio this responsibility Justice Robertson would have us assume?
NOTES
[1] George Tokman pled not guilty to the capital murder of Albert Taylor and was convicted and sentenced to death. Jerry Fuson pled guilty to manslaughter with a twenty-year recommendation by the district attorney's office in return for his testimony against Tokman and Leatherwood.
[2] Mississippi Code Annotated section 99-19-101(6)(e) provides as a mitigating circumstance that "The defendant acted under extreme duress or under the substantial domination of another person."
[3] Mississippi Code Annotated section 99-19-101(6)(e) (Supp. 1982) states that the defendant acted under extreme duress or under the substantial domination of another person.
[4] Leatherwood testified that he felt remorse from the day the killing occurred.
[5] See Appendix "A".
[1] It might even be persuasively argued that the Legislature has not only given us the authority, but implores our use of it. I submit it is far better, as well as considerably less expensive a burden on the taxpayers of this state, for us to terminate one of these cases, rather than have it terminated years later after protracted federal court proceedings. There are now 30 prisoners on death row at our state penitentiary. Nearly all of these inmates have federal court proceedings in progress to spare their lives. The last execution in Mississippi was 1964.
[2] Theodore Dreiser, in An American Tragedy, recalls a young man similar to Leatherwood.
[1] We note that in Tokman v. State, 435 So.2d 664, a companion case to this one, No. 53,676 on this Court's docket, such an instruction was granted. See Instruction D-16 in Tokman. These two prosecutions arise out of the same capital murder. We are at a loss to understand why the trial judge would grant such an instruction in the Tokman case and refuse it in the Leatherwood case.
[2] There is another related instruction that ought to have been granted but wasn't. It reads:

JURY INSTRUCTION NO. 2
The court instructs the jury that the prosecution carries the burden of showing not only that aggravating circumstances exist but also that they are sufficient enough to warrant death. If the prosecution merely proves the existence of an aggravating circumstance, you are free to find it insufficient to warrant death and are not required to automatically impose death.
[3] Justice Hawkins has written an excellent opinion discussing essentially the same issue in Hill v. State, 432 So.2d 427, (1983) [Hawkins, J., dissenting as to Part IV(I)]. I have concurred in that opinion. Believing as I do that the point is logically compelling and legally sound, I approach it here from a different, perhaps more theoretical perspective. My opinion here is intended to complement Justice Hawkins' dissenting opinion in the Alvin Hill case.
[4] As indicated above, Instruction No. 25 was requested at the trial level but was denied. The point has not been assigned as error here. For the reasons stated by Justice Hawkins in his dissenting opinion in the Alvin Hill case and for the reasons I state hereafter, I consider the point fundamental. This Court has a longstanding and venerable tradition in death penalty cases of searching the record and considering on appeal arguably meritorious points even though not formally assigned as error. See, e.g., Augustine v. State, 201 Miss. 731, 29 So.2d 454 (1947); Gipson v. State, 203 Miss. 434, 437, 35 So.2d 327, 328 (1948); Shaffer v. State, 46 So.2d 545, 545 (Miss. 1950); Russell v. State, 226 Miss. 885, 886, 85 So.2d 585 (1956); Drake v. State, 228 Miss. 589, 590, 89 So.2d 593, 593 (Miss. 1956); Irving v. State, 228 So.2d 266, 268 (Miss. 1969); Bell v. State, 360 So.2d 1206, 1215, 1217-1218 (Miss. 1978). Informed by that tradition and experience, I consider the trial judge's refusal to grant Jury Instruction No. 25 a viable issue before the Court on this appeal.
[5] Since the reinstatement of the death penalty in many states following Furman v. Georgia, 408 U.S. 238, 92 S.Ct. 2726, 33 L.Ed.2d 346 (1972); there have been at least six documented cases in which death sentences were imposed (though fortunately not executed) upon persons later found not guilty. In Arizona in 1977, Jonathan Treadaway, a capital defendant who had been sentenced to death and whose conviction had been reversed, see State v. Treadaway, No. CR83446, slip op. (Ariz.Sup.Ct. 1977). In 1978, Earl Charles was ordered freed by a superior court judge in Savannah, Georgia, who three and one-half years earlier had sentenced him to death, because Charles' innocence was demonstrated by a police detective who came forward to admit that he had seen him at work on the date and at the time that the crime was committed. See State v. Charles, No. 23,392 (Ga.S.Ct. July 5, 1978) (statement of prosecutor's intent to place case on dead docket). See also Atlanta Constitution, July 6, 1978, § A, at 1, col. 3, Savannah Morning News, June 15, 1978, § D, at 1. Also in 1978, the Court of Appeals for the Fifth Circuit granted Calvin Sellars bond pending state appeals, affirming a district court judge who held that he had been convicted and sentenced to death based upon perjured testimony. See Sellars v. Estelle, 571 F.2d 1314 (5th Cir.1978) (per curiam). See also Sellars v. Estelle, 450 F. Supp. 1245 (S.D.Tex. 1978). In 1979 prosecutors decided not to retry Sellars because a key witness could not be found. In 1979, Gary Beeman, who had been sentenced to death, having successfully appealed his conviction, was retried a second time and was acquitted. See Ohio v. Beeman, No. 9833, slip op. (Ashtabula County Ct.C.P.) (sentenced June 28, 1976, acquitted from second trial October 4, 1979); Ohio v. Beeman, No. 894, slip op. (Ohio Ct. App., 11th App.Dist. April 20, 1978) (reversing first conviction). In the same year, Erwin Simants, following a successful state post-conviction petition, see Simants v. State, 202 Neb. 828, 277 N.W.2d 217 (1979), was acquired at a new trial by reason of insanity, see Simants v. State, No. B2904, slip op. (Lincoln County, Nebraska D.Ct. October 1980). Finally, in 1980, a district attorney in Flint Judicial Circuit of Georgia released Jerry Banks, who had been sentenced to death and who had spent 6 years in prison litigating his case in appellate and post-appellate proceedings, because the prosecution was found to have withheld critical evidence. See Atlanta Constitution, January 6, 1981, § A, at 1, col. 1. See also Banks v. State, 235 Ga. 121, 218 S.E.2d 851 (1975) (reversing original conviction on grounds that prosecutor knowingly withheld evidence favorable to defendant); Wicker, The Final Verdict, N.Y. Times, Oct. 17, 1980, § A, at 31, col. 5. Banks had been sentenced to death again after a second trial. See Banks v. Glass, 242 Ga. 518, 250 S.E.2d 431 (1978) (denying habeas petition); Banks v. State, 237 Ga. 325, 227 S.E.2d 380 (1976), cert. denied, 430 U.S. 975, 97 S.Ct. 1667, 52 L.Ed.2d 370 (1977). And what Mississippian does not know the saga of Will Purvis [Purvis v. State, 71 Miss. 706, 14 So. 268 (1894)] whose noose slipped as he fell from the hangman's scaffold. The true murderer later confessed.
[6] Here we would remind one and all of Justice Hawkins' eloquent dissent in Johnson v. State, 416 So.2d 383, 393-399 (Miss. 1982).
[7] Judge Hand used these words in a First Amendment context. See United States v. Associated Press, 52 F. Supp. 362, 372 (S.D.N.Y. 1943). They are no less apt here.
[1] See, e.g., Erie Railroad Co. v. Tompkins, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938).